**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AL-HARAMAIN ISLAMIC FOUNDATION,
INC., an Oregon Nonprofit
Corporation; WENDELL BELEW, a
U.S. Citizen and Attorney at Law;
ASIM GHAFOOR, a U.S. Citizen and
Attorney at Law,
                 *Plaintiffs-Appellees,*

v.

GEORGE W. BUSH, President of the
United States, et al.,
                 *Defendants-Appellants.*

No. 06-36083

D.C. Nos.
MDL-CV-06-1791-
VRW
CV-07-00109-VRW

OPINION

Appeal from the United States District Court
for the Northern District of California
Garr M. King, District Judge, Presiding

Argued and Submitted
August 15, 2007—San Francisco, California

Filed November 16, 2007

Before: Harry Pregerson, Michael Daly Hawkins, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

14955

**COUNSEL**

Paul D. Clement, Solicitor General, Gregory G. Garre, Deputy Solicitor General, Daryl Joseffer, Assistant to the Solicitor General, Washington, D.C.; Peter D. Keisler, Assistant Attorney General, and Douglas N. Letter, Thomas M. Bondy, Anthony A. Yang, Appellate Staff, Civil Division, Washington, D.C., for the defendants-appellants.

Jon B. Eisenberg, William N. Hancock, Eisenberg and Hancock LLP, Oakland, California; Lisa R. Jaskol, Los Angeles, California; Thomas H. Nelson, Zaha S. Hassan, Thomas H. Nelson & Associates, Welches, Oregon; Steven Goldberg, Portland, Oregon; J. Ashlee Albies, Law Offices of J. Ashlee Albies, Portland, Oregon, for the plaintiffs-appellees.

## OPINION

McKEOWN, Circuit Judge:

Following the terrorist attacks on September 11, 2001, President George W. Bush authorized the National Security Agency ("NSA") to conduct a warrantless communications surveillance program. The program intercepted international communications into and out of the United States of persons alleged to have ties to Al Qaeda and other terrorist networks. Though its operating parameters remain murky, and certain details may forever remain so, much of what is known about the Terrorist Surveillance Program ("TSP") was spoon-fed to the public by the President and his administration.

After *The New York Times* first revealed the program's existence in late 2005, government officials moved at lightning-speed to quell public concern and doled out a series of detailed disclosures about the program. Only one day after *The New York Times*' story broke, President Bush informed the country in a public radio address that he had authorized the interception of international communications of individuals with known links to Al Qaeda and related terrorist organizations. Two days after President Bush's announcement, then-Attorney General Alberto Gonzales disclosed that the program targeted communications where the government had concluded that one party to the communication was a member of, or affiliated with, Al Qaeda. The Department of Justice followed these and other official disclosures with a lengthy white paper in which it both confirmed the existence of the surveillance program and also offered legal justification of the intercepts.

The government's plethora of voluntary disclosures did not go unnoticed. Al-Haramain Islamic Foundation, a designated terrorist organization, and two of its attorneys (collectively, "Al-Haramain") brought suit against President Bush and other executive branch agencies and officials. They claimed that

they were subject to warrantless electronic surveillance in 2004 in violation of the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801 *et seq.* ("FISA"), various provisions of the United States Constitution, and international law. The government countered that the suit is foreclosed by the state secrets privilege, an evidentiary privilege that protects national security and military information in appropriate circumstances.

Essential to substantiating Al-Haramain's allegations against the government is a classified "Top Secret" document (the "Sealed Document") that the government inadvertently gave to Al-Haramain in 2004 during a proceeding to freeze the organization's assets. Faced with the government's motions to dismiss and to bar Al-Haramain from access to the Sealed Document, the district court concluded that the state secrets privilege did not bar the lawsuit altogether. The court held that the Sealed Document was protected by the state secrets privilege and that its inadvertent disclosure did not alter its privileged nature, but decided that Al-Haramain would be permitted to file *in camera* affidavits attesting to the contents of the document based on the memories of lawyers who had received copies.

In light of extensive government disclosures about the TSP,[1] the government is hard-pressed to sustain its claim that the very subject matter of the litigation is a state secret. Unlike a truly secret or "black box" program that remains in the shadows of public knowledge, the government has moved affirmatively to engage in public discourse about the TSP. Since President Bush's initial confirmation of the program's existence, there has been a cascade of acknowledgments and

---

[1]Though the media has reported that President Bush also authorized the warrantless surveillance of purely domestic communications, *see, e.g.*, Leslie Cauley, *NSA Has Massive Database of Americans' Phone Calls*, USA TODAY, May 11, 2006, at A1, Al-Haramain's claims concern only surveillance allegedly conducted under the auspices of the publicly-acknowledged TSP.

information coming from the government, as officials have openly, albeit selectively, described the contours of this program. Thus, we agree with the district court that the state secrets privilege does not bar the very subject matter of this action. After *in camera* review and consideration of the government's documentation of its national security claim, we also agree that the Sealed Document is protected by the state secrets privilege. However, we reverse the court's order allowing Al-Haramain to reconstruct the essence of the document through memory. Such an approach countenances a back door around the privilege and would eviscerate the state secret itself. Once properly invoked and judicially blessed, the state secrets privilege is not a half-way proposition.

Nonetheless, our resolution of the state secrets issue as applied to the Sealed Document does not conclude the litigation. Al-Haramain also claims that FISA preempts the common law state secrets privilege. We remand for determination of this claim, a question the district court did not reach in its denial of the government's motion to dismiss.

## BACKGROUND

### I.   FACTUAL BACKGROUND[2]

On December 16, 2005, the New York Times reported that in the years following September 11, 2001, President Bush secretly authorized the NSA to conduct electronic surveillance on Americans and others without warrants. James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. TIMES, Dec. 16, 2005, at A1. The next day, President Bush confirmed in a radio address that he had autho-

---

[2]Pursuant to special procedures established by the Department of Justice, Litigation Security Section, the members of the panel reviewed the Sealed Document and the non-public classified versions of the pleadings and declarations. Our recitation of facts derives only from publicly-filed pleadings, including public versions of the declarations.

rized "the interception of international communications of people with known links to Al Qaeda and related terrorist organizations." George W. Bush, President's Radio Address (Dec. 17, 2005), http://www.whitehouse.gov/news/releases/2005/12/20051217.html (last visited Nov. 8, 2007). The President acknowledged that he reauthorized the program more than 30 times since September 11, 2001, but that the program was suspended in January 2007. *Id.*

Then-Attorney General Alberto Gonzales, and other administration officials, also disclosed in public statements that the NSA, under the TSP, intercepted electronic information where the government had grounds to believe that one party to the communication was a member or agent of a terrorist organization affiliated with Al Qaeda. *See* Press Briefing by Attorney General Alberto Gonzales and General Michael V. Hayden, Principal Deputy Director for National Intelligence (Dec. 19, 2005), http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html (last visited Nov. 8, 2007). Attorney General Gonzales emphasized that the government had not engaged in "blanket surveillance," but instead attempted to hone in on individuals who had apparent links to Al Qaeda. *Id.* The government stated that interception under the program took place only if there were reasonable grounds to believe that one party to the communication was a member or agent of Al Qaeda or an affiliated terrorist organization. *Id.* The government did not obtain warrants for this surveillance, which took place outside the context of the Foreign Intelligence Surveillance Court ("FISC"). In January 2007, Attorney General Gonzales stated that this type of surveillance is now subject to the judicial jurisdiction of the FISC. Letter from Alberto Gonzales, Attorney General, to Patrick Leahy and Arlen Specter, Senators (Jan. 17, 2007), *available at* http://leahy.senate.gov/press/200701/1-17-07%20AG%20to%20PJL%20Re%20FISA%20Court.pdf.

Al-Haramain is a Muslim charity which is active in more than 50 countries. Its activities include building mosques and

maintaining various development and education programs. The United Nations Security Council has identified Al-Haramain as an entity belonging to or associated with Al Qaeda. In February 2004, the Office of Foreign Assets Control of the Department of Treasury temporarily froze Al-Haramain's assets pending a proceeding to determine whether to declare it a "Specially Designated Global Terrorist" due to the organization's alleged ties to Al Qaeda. Ultimately, Al-Haramain and one of its directors, Soliman Al-Buthi, were declared "Specially Designated Global Terrorists."

In August 2004, during Al-Haramain's civil designation proceeding, the Department of the Treasury produced a number of unclassified materials that were given to Al-Haramain's counsel and two of its directors. Inadvertently included in these materials was the Sealed Document, which was labeled "TOP SECRET." Al-Haramain's counsel copied and disseminated the materials, including the Sealed Document, to Al-Haramain's directors and co-counsel, including Wendell Belew and Asim Ghafoor. In August or September of 2004, a reporter from *The Washington Post* reviewed these documents while researching an article. In late August, the FBI was notified of the Sealed Document's inadvertent disclosure. In October of 2004, the FBI retrieved all copies of the Sealed Document from Al-Haramain's counsel, though it did not seek out Al-Haramain's directors to obtain their copies. The Sealed Document is located in a Department of Justice Secured Compartmentalized Information Facility.

Al-Haramain alleges that after *The New York Times*' story broke in December 2005, it realized that the Sealed Document was proof that it had been subjected to warrantless surveillance in March and April of 2004. Though the government has acknowledged the existence of the TSP, it has not disclosed the identities of the specific persons or entities surveilled under the program, and disputes whether Al-Haramain's inferences are correct.

## II.   PROCEEDINGS IN THE DISTRICT COURT

In February 2006, Al-Haramain filed a complaint in the District of Oregon alleging violations of FISA, the First, Fourth, and Sixth Amendments to the United States Constitution, the doctrine of separation of powers, and the International Covenant on Civil and Political Rights. Al-Haramain sought damages and declaratory relief, alleging that the government engaged in electronic surveillance of Al-Haramain's private telephone, email, and other electronic communications without probable cause, warrants, or other prior authorization. Al-Haramain also provided a sealed copy of the Sealed Document to the district court.

The government moved to dismiss the case, or in the alternative, for summary judgment, on the basis of the state secrets privilege, asserting that the very subject matter of the action was a state secret. In support of its motion, the government submitted public and classified versions of declarations from John Negroponte, then-Director of National Intelligence, and Keith Alexander, then-Director of the NSA. Director Negroponte asserted that continuation of the litigation would result in the disclosure of information relating both to the nature of the Al Qaeda threat and the TSP, which could cause grave damage to national security.

The government also moved to bar Al-Haramain from any access to the Sealed Document. John F. Hackett, Director of the Information Management Office of the Office of the Director of National Intelligence, asserted in a May 12, 2006, declaration: "Based upon my review of the document filed under seal with the Court, it is not possible to describe the document in a meaningful manner without revealing classified information, including classified sources and methods of intelligence."

The district court denied the government's motion to dismiss, finding that the existence of the TSP was not a secret,

and that "no harm to the national security would occur if plaintiffs are able to prove the general point that they were subject to surveillance as revealed in the Sealed Document, without publicly disclosing any other information contained in the Sealed Document." *Al-Haramain Islamic Foundation, Inc. v. Bush*, 451 F. Supp. 2d 1215, 1224 (D. Or. 2006).

According to the district court, there was "no reasonable danger that the national security would be harmed if it is confirmed or denied that plaintiffs were subject to surveillance." *Id.* The district court granted the government's motion to bar Al-Haramain from access to the Sealed Document on the basis that it was protected by the state secrets privilege. The court stated that it would, however, permit Al-Haramain-related witnesses to file *in camera* affidavits attesting from memory to the contents of the document to support Al-Haramain's assertion of standing and its prima facie case. *Id.* at 1229.

The district court sua sponte certified its order for interlocutory appeal. The case was then transferred to the Northern District of California by the Multi-District Litigation panel to Chief Judge Vaughn Walker. We granted interlocutory review, and consolidated this appeal with *Hepting v. AT&T Corp.*, Nos. 06-17132, 06-17137.[3]

## STANDARD OF REVIEW

Although we have not previously addressed directly the standard of review for a claim of the state secrets privilege, we have intimated that our review is de novo. *See Kasza v. Browner*, 133 F.3d 1159 (9th Cir. 1998) (implying without stating that de novo review governs state secrets determina-

---

[3]Although this case and *Hepting* were argued on the same day, and both relate to alleged government electronic surveillance, the claimed facts and circumstances of each case are distinct. Thus, we are concurrently entering an order stating that the cases are no longer consolidated for any purpose.

tion). De novo review as to the legal application of the privilege and clear error review as to factual findings make sense, as the determination of privilege is essentially a legal matter based on the underlying facts. We accord other privileges, such as the attorney-client privilege, a similar status—clear error as to factual determinations by the district court, but de novo review as to the application of legal principles to those facts. *See United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997). Other circuits are in accord regarding review of the state secrets privilege. *See El-Masri v. United States*, 479 F.3d 296, 302 (4th Cir. 2007); *Molerio v. FBI*, 749 F.2d 815, 820 (D.C. Cir. 1984). Standing is also reviewed de novo. *Buono v. Norton*, 371 F.3d 543, 546 (9th Cir. 2004).

## ANALYSIS

## I. THE STATE SECRETS PRIVILEGE

**[1]** The state secrets privilege is a common law evidentiary privilege that permits the government to bar the disclosure of information if "there is a reasonable danger" that disclosure will "expose military matters which, in the interest of national security, should not be divulged." *United States v. Reynolds*, 345 U.S. 1, 10 (1953). The privilege is not to be lightly invoked. *Id.* at 7.

Although *Reynolds* is widely viewed as the first explicit recognition of the privilege by the Supreme Court, *see* Amanda Frost, *The State Secrets Privilege and Separation of Powers*, 75 FORDHAM L. REV. 1931, 1936 (2007), the Supreme Court considered a form of the privilege—the non-justiciability of certain state secrets cases—in *Totten v. United States*, 92 U.S. 105 (1875). *Totten* arose out of a contract between President Lincoln and a secret agent who was allegedly dispatched to spy on enemy troops. As the Court explained in a very short opinion, "[i]t may be stated as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevita-

bly lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." *Id.* at 107. The court then barred suit regarding the contract, as "[t]he secrecy which such contracts impose precludes any action for their enforcement," and noted that "the existence of a contract of that kind is itself a fact not to be disclosed." *Id.*

As the Supreme Court noted in a later case involving an alleged agreement for espionage services, "lawsuits premised on alleged espionage agreements are altogether forbidden." *Tenet v. Doe*, 544 U.S. 1 (2005). This conclusion has evolved into the principle that where the very subject matter of a lawsuit is a matter of state secret, the action must be dismissed without reaching the question of evidence. *Reynolds*, 345 U.S. at 11 n.26; *see also Kasza*, 133 F.3d at 1166; *Sterling v. Tenet*, 416 F.3d 338, 345 (4th Cir. 2005) (Dismissal is proper if "sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters.") (internal citation omitted).

More than 75 years passed before the Supreme Court directly addressed the state secrets privilege, observing that "[j]udicial experience with the privilege which protects military and state secrets has been limited in this country. English experience has been more extensive, but still relatively slight compared with other evidentiary privileges." *Reynolds*, 345 U.S. at 7 (footnotes omitted). In *Reynolds*, the Court addressed the privilege at length, analogizing to the policy and legal parameters of other privileges, such as the privilege against self-incrimination. *See id.* at 8-9.

These two cases—*Totten* and *Reynolds*—thus provide the foundation for our analysis. Although there is only a single state secrets evidentiary privilege, as a matter of analysis, courts have approached the privilege as both a rule of non-justiciability, akin to a political question, and as a privilege

that may bar proof of a prima facie case. *See ACLU v. Nat'l Sec. Agency*, 493 F.3d 644, 650 n.2 (6th Cir. 2007) ("The State Secrets Doctrine has two applications: a rule of evidentiary privilege and a rule of non-justiciability.") (internal citations omitted); *Kasza*, 133 F.3d at 1166 (holding that if a plaintiff cannot prove the prima facie elements of one's claim without resort to privileged information, the court may dismiss).

Mirroring these applications of the state secrets privilege, on appeal the government argues that the state secrets privilege mandates the dismissal of Al-Haramain's claims for three reasons: (1) the very subject matter of the litigation is a state secret; (2) Al-Haramain cannot establish standing to bring suit, absent the Sealed Document; and (3) Al-Haramain cannot establish a prima facie case, and the government cannot defend against Al-Haramain's assertions, without resorting to state secrets.[4]

## II.   THE SUBJECT MATTER OF THE LITIGATION IS NOT A STATE SECRET

Based on the various public statements made by the President and members of his administration acknowledging the existence of the TSP, and Al-Haramain's purported knowledge that its members' communications had been intercepted, the district court rejected the government's contention that the subject matter of the litigation is a state secret. *See Al-Haramain*, 451 F. Supp. 2d at 1225. The court found that the government had "lifted the veil of secrecy on the existence of

---

[4]The district court declined to decide whether Al-Haramain's claims should be dismissed on the ground that Al-Haramain would be unable to make a prima facie case, or that the government would be unable to assert a defense, without treading upon state secrets. *See Al-Haramain*, 451 F. Supp. 2d at 1226. It recognized that non-public details of the TSP might eventually be implicated by Al-Haramain's claims, but stated that it was "not yet convinced that this information is relevant to the case and will need to be revealed." *Id.*

the [TSP] and plaintiffs only seek to establish whether inter-
ception of their communications . . . was unlawful." *Id.*

[2] We agree with the district court's conclusion that the
very subject matter of the litigation—the government's
alleged warrantless surveillance program under the TSP—is
not protected by the state secrets privilege. Two discrete sets
of unclassified facts support this determination. First, Presi-
dent Bush and others in the administration publicly acknowl-
edged that in the months following the September 11, 2001,
terrorist attacks, the President authorized a communications
surveillance program that intercepted the communications of
persons with suspected links to Al Qaeda and related terrorist
organizations. Second, in 2004, Al-Haramain was officially
declared by the government to be a "Specially Designated
Global Terrorist" due to its purported ties to Al Qaeda. The
subject matter of the litigation—the TSP and the govern-
ment's warrantless surveillance of persons or entities who,
like Al-Haramain, were suspected by the NSA to have con-
nections to terrorists—is simply not a state secret. At this
early stage in the litigation, enough is known about the TSP,
and Al-Haramain's classification as a "Specially Designated
Global Terrorist," that the subject matter of Al-Haramain's
lawsuit can be discussed, as it has been extensively in
publicly-filed pleadings, televised arguments in open court in
this appeal,[5] and in the media and the blogosphere, without
disturbing the dark waters of privileged information.

Because cases in this area are scarce, no court has put a fine
point on how broadly or narrowly "subject matter" is defined
in the context of state secrets. Application of this principle
must be viewed in the face of the specific facts alleged and

---

[5]Pursuant to a camera request filed before argument, we permitted C-
SPAN to record the proceeding for later broadcast. *See* 9TH CIR. GUIDELINES
FOR PHOTOGRAPHING, RECORDING, AND BROADCASTING IN THE COURTROOM
(1996). The proceeding was broadcast on C-SPAN on August 15, 2007,
and is available at www.c-span.org.

the scope of the lawsuit. In this case, the analysis is not diffi-cult because Al-Haramain challenges warrantless surveillance authorized under the TSP. Significantly, until disclosure of the program in 2005, the program and its details were a highly prized government secret.

**[3]** The first disclosure may have come from *The New York Times*, but President Bush quickly confirmed the existence of the TSP just one day later, on December 17, 2005, in a radio address to the nation. The President's announcement that he had authorized the NSA to intercept the international commu-nications of individuals with known links to Al Qaeda cast the first official glimmer of light on the TSP. Since then, govern-ment officials have made voluntary disclosure after voluntary disclosure about the TSP, selectively coloring in the contours of the surveillance program and even hanging some of it in broad daylight.

Two days after President Bush's announcement, Attorney General Gonzales disclosed that the TSP intercepted commu-nications where one party was outside the United States, and the government had "a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affili-ated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda." Press Briefing by Attorney General Alberto Gonzales and General Michael V. Hayden, Principal Deputy Director for National Intelligence (Dec. 19, 2005), http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html (last visited Nov. 8, 2007). Attorney General Gonzales confirmed that surveillance occurred without FISA warrants ("FISA requires that we get a court order, unless authorized by a statute, and we believe that authorization has occurred."), and that American citizens could be surveilled only if they communicated with a sus-pected or known terrorist ("To the extent that there is a mod-erate and heavy communication involving an American citizen, it would be a communication where the other end of the call is outside the United States and where we believe

either the American citizen or the person outside the United States is somehow affiliated with Al Qaeda."). *Id.*

In an address to the National Press Club on January 23, 2006, General Hayden volunteered further details about the TSP:

> [T]here are no communications more important to the safety of this country than those affiliated with al Qaeda with one end in the United States. The president's authorization allows us to track this kind of call more comprehensively and more efficiently. The trigger is quicker and a bit softer than it is for a FISA warrant, but the intrusion into privacy is also limited: only international calls and only those we have a reasonable basis to believe involve al Qaeda or one of its affiliates.

General Michael V. Hayden, Address to the National Press Club (Jan. 23, 2006), http://www.dni.gov/speeches/ 20060123_speech.htm (last visited Nov. 8, 2007). In the same speech, he asserted that the TSP was "targeted and focused," and that at least one participant to the conversation was not in the United States, revealing that "this is not about intercepting conversations between people in the United States." *Id.* He even volunteered details as to the TSP's procedures for inadvertently intercepting a purely domestic call:

> And if there were ever an anomaly, and we discovered that there had been an inadvertent intercept of a domestic-to-domestic call, that intercept would be destroyed and not reported. But the incident, what we call inadvertent collection, would be recorded and reported. But that's a normal NSA procedure. It's been our procedure for the last quarter century. And as always, as we always do when dealing with U.S. person information, as I said earlier, U.S. iden-

> tities are expunged when they're not essential to understanding the intelligence value of any report.

*Id.*

General Hayden's statements provided to the American public a wealth of information about the TSP. The public now knows the following additional facts about the program, beyond the general contours outlined by other officials: (1) at least one participant for each surveilled call was located outside the United States; (2) the surveillance was conducted without FISA warrants; (3) inadvertent calls involving purely domestic callers were destroyed and not reported; (4) the inadvertent collection was recorded and reported; and (5) U.S. identities are expunged from NSA records of surveilled calls if deemed non-essential to an understanding of the intelligence value of a particular report. These facts alone, disclosed by General Hayden in a public address, provide a fairly complete picture of the scope of the TSP.

Just a month after the President's announcement, on January 19, 2006, the United States Department of Justice joined the succession of government disclosures in a 42-page white paper in which it not only confirmed that President Bush had authorized the interception of international communications into and out of the United States, but also justified the intercepts with a legal analysis. U.S. Department of Justice, *Legal Authorities Supporting the Activities of the National Security Agency Described by the President* (Jan. 19, 2006), http://www.usdoj.gov/opa/whitepaperonnsalegalauthorities.pdf (last visited Nov. 8, 2007). That the Department of Justice even thought it necessary to explain to the public "in an unclassified form, the legal basis for the NSA activities described by the President," *see id.* at 1, suggests that the government both knew that details of the surveillance program were in the public sphere and recognized that the program was already the subject of significant public discussion and interest.

The white paper disclosed other, as yet, non-public information about the TSP, such as the NSA's "use of signals intelligence to identify and pinpoint the enemy." *Id.* at 17. The "NSA activities are directed at the enemy, and not at domestic activity that might incidentally aid the war effort," *id.* at 34, and were "designed to enable the Government to act quickly and flexibly (and with secrecy) to find agents of al Qaeda and its affiliates." *Id.* at 39. The TSP, intended to " 'connect the dots' between potential terrorists," was "carefully reviewed approximately every 45 days" by the Department of Justice, and Congressional leaders were briefed more than a dozen times on the agency's activities. *Id.* at 5 (quoting George W. Bush, President's Press Conference (Dec. 19, 2005), http://www.whitehouse.gov/news/releases/2005/12/20051219-2.html (last visited Nov. 8, 2007)).

**[4]** To be sure, there are details about the program that the government has not yet disclosed, but because of the voluntary disclosures made by various officials since December 2005, the nature and purpose of the TSP, the "type" of persons it targeted, and even some of its procedures are not state secrets. In other words, the government's many attempts to assuage citizens' fears that *they* have not been surveilled now doom the government's assertion that the very subject matter of this litigation, the existence of a warrantless surveillance program, is barred by the state secrets privilege.

In arguing that the sensitive subject matter of this litigation mandates dismissal, the government points to *Kasza*, in which we affirmed the dismissal of an action on the basis of the state secrets privilege. 133 F.3d at 1170. *Kasza* provides scant guidance to us in this case. *Kasza* involved former employees at a classified Air Force facility who challenged under the Resource Conservation and Recovery Act of 1986 ("RCRA") the government's allegedly improper treatment of hazardous materials. The Secretary of the Air Force invoked the state secrets privilege with respect to ten categories of national

security information associated with the operating location, including "security sensitive environmental data." *Id.* at 1163.

We dismissed the action on the basis that its very subject matter was a state secret, but we were, perhaps purposefully, vague as to the specific reasons. The opinion simply stated that the disclosure of information sought in discovery requests "would reasonably endanger national security interests," and that "any further proceeding in this matter would jeopardize national security." 133 F.3d at 1170. Absent some insight into our reasoning, *Kasza* does not inform our determination here, except to confirm that some cases are, indeed, non-justiciable as a consequence of the very subject matter of the action being a state secret.

Nor are we persuaded by the recent case of *El-Masri*. Khaled El-Masri, a German citizen of Lebanese descent, brought claims stemming from injuries allegedly received during his detention under the Central Intelligence Agency's ("CIA") "extraordinary rendition" program. *El-Masri*, 479 F.3d at 300. The government defended the suit on the basis of the state secrets privilege, but El-Masri argued that the state secrets privilege did not require dismissal of his claims because the CIA's program had been widely discussed in the press and in public fora, and acknowledged by administration officials. *See id.* at 301. El-Masri maintained that the subject of his suit was only his particular rendition, not the renditions of other victims, and that the litigation posed no harm to national security because sufficient information had entered the public sphere to enable him to pursue his claims without compromising state secrets. *See id.* at 308.

The Fourth Circuit upheld the government's assertion of the state secrets privilege and dismissed the action. To establish liability, El-Masri would be required to produce "evidence that exposes how the CIA organizes, staffs, and supervises its most sensitive intelligence operations." *Id.* at 309. For example, to establish then-Director of the CIA

George Tenet's liability, El-Masri would be "obliged to show in detail how the head of the CIA participates in such operations, and how information concerning their progress is relayed to him." *Id.* Dismissal was proper because the information that was known to the public about the renditions program did not include "facts that are central to litigating [El-Masri's] action." *Id.* at 311.

The court in *El-Masri* stated that "for purposes of the state secrets analysis, the 'central facts' and 'very subject matter' of an action are those facts that are essential to prosecuting the action or defending against it." *Id.* at 308. According to the Fourth Circuit, the subject matter of a lawsuit requires its dismissal if the action cannot be "*litigated* without threatening the disclosure of [ ] state secrets." *Id.* (emphasis in original). In other words, that court merged the concept of "subject matter" with the notion of proof of a prima facie case. Indeed, in that case, the facts may have counseled for such an approach.

In contrast, we do not necessarily view the "subject matter" of a lawsuit as one and the same with the facts necessary to litigate the case. In *Kasza*, we made the distinction between dismissal on the grounds that the subject matter of an action is a state secret, and dismissal on the grounds that a plaintiff cannot prove the prima facie elements of the claim absent privileged evidence. *See* 133 F.3d at 1166. The parties, including the government, also made this distinction in their briefs, as did the district court in its decision. *See Al-Haramain*, 451 F. Supp. 2d at 1226. Because the Fourth Circuit has accorded an expansive meaning to the "subject matter" of an action, one that we have not adopted, *El-Masri* does not support dismissal based on the subject matter of the suit.

To be sure, a bright line does not always separate the subject matter of the lawsuit from the information necessary to establish a prima facie case. In some cases, there may be no dividing line. In other cases, the suit itself may not be barred because of its subject matter and yet ultimately, the state

secrets privilege may nonetheless preclude the case from proceeding to the merits. In other circumstances, the decision on the state secrets privilege may need to await preliminary discovery. It is precisely because of this continuum of analysis that the courts, the parties, and the commentators tend to treat the "subject matter" issue as a separate threshold determination.

**[5]** Al-Haramain's case does involve privileged information, but that fact alone does not render the very subject matter of the action a state secret. Accordingly, we affirm the district court's denial of dismissal on that basis.

### III.   THE GOVERNMENT'S INVOCATION OF THE STATE SECRETS PRIVILEGE

**[6]** Although the very subject matter of this lawsuit does not result in automatic dismissal, we must still address the government's invocation of the state secrets privilege as to the Sealed Document and its assertion that Al-Haramain cannot establish either standing or a prima facie case without the use of state secrets. Our analysis of the state secrets privilege involves three steps. First, we must "ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied." *El-Masri*, 479 F.3d at 304; *see also Reynolds*, 345 U.S. at 7-8. Second, we must make an independent determination whether the information is privileged. *El-Masri*, 479 F.3d at 304. In deciding whether the privilege attaches, we may consider a party's need for access to the allegedly privileged information. *See Reynolds*, 345 U.S. at 11. Finally, "the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim." *El-Masri*, 479 F.3d at 304.

With respect to the first step, *Reynolds* requires the government to make a "formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." 345 U.S. at 7-

8 (footnotes omitted). The parties do not dispute that the procedural requirements for invoking the state secrets privilege have been met. The government formally lodged its claim of privilege through classified and unclassified declarations filed by then-Director of National Intelligence, John Negroponte, as Head of the United States Intelligence Community,[6] and Lieutenant General Keith B. Alexander, Director, National Security Agency.

Next, we must determine whether the circumstances before us counsel that the state secrets privilege is applicable, without forcing a disclosure of the very thing that the privilege is designed to protect. *Id.* at 7-8. Two claims of privilege are at issue, although they are intertwined and we refer generally to both under the rubric of the Sealed Document: (1) whether Al-Haramain was subject to surveillance and (2) the Sealed Document. This case presents a most unusual posture because Al-Haramain has seen the Sealed Document and believes that its members were subject to surveillance. The district court held, however, that "because the government has not officially confirmed or denied whether plaintiffs were subject to surveillance, even if plaintiffs know they were, this information remains secret. Furthermore, while plaintiffs know the

---

[6]The United States Intelligence Community includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal Bureau of Investigation, the Department of Treasury, the Department of Energy, Drug Enforcement Administration, and the Coast Guard; the Bureau of Intelligence and Research of the Department of State; the elements of the Department of Homeland Security concerned with the analysis of intelligence information; and such other elements of any other department or agency as may be designated by the President, or jointly designated by the DNI and heads of the department or agency concerned, as an element of the Intelligence Community. *See* 50 U.S.C. § 401a(4).

contents of the [Sealed] Document, it too remains secret." *Al-Haramain*, 451 F. Supp. 2d at 1223.

The district court also concluded that the government did not waive its privilege by inadvertent disclosure of the Sealed Document. *Id.* at 1228. Because Al-Haramain unwittingly knows the contents of the Sealed Document, its allegations and pleadings are founded on information that it believes is derived from the document without revealing the content of the document. This convoluted sentence and explication underscore the practical difficulty for us in writing about a privileged document, while being cautious not to disclose any national security information. Unlike the alleged spies in *Totten* and *Tenet*, who were knowing parties to a secret contract with the government, Al-Haramain is privy to knowledge that the government fully intended to maintain as a national security secret. Unlike the contract for secret services in *Totten*, which was "itself a fact not to be disclosed," the fact of the previously-secret surveillance program is "itself a fact [that has been] disclosed." 92 U.S. at 107.

Despite this wrinkle, we read *Reynolds* as requiring an *in camera* review of the Sealed Document in these circumstances. "[T]he showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." *Reynolds*, 345 U.S. at 11. We reviewed the Sealed Document *in camera* because of Al-Haramain's admittedly substantial need for the document to establish its case.

**[7]** Having reviewed it *in camera*, we conclude that the Sealed Document is protected by the state secrets privilege, along with the information as to whether the government surveilled Al-Haramain. We take very seriously our obligation to review the documents with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege. Simply saying "military secret," "national security" or "terrorist threat" or invoking an ethereal

fear that disclosure will threaten our nation is insufficient to support the privilege. Sufficient detail must be—and has been—provided for us to make a meaningful examination. The process of *in camera* review ineluctably places the court in a role that runs contrary to our fundamental principle of a transparent judicial system. It also places on the court a special burden to assure itself that an appropriate balance is struck between protecting national security matters and preserving an open court system. That said, we acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena.

For example, at some level, the question whether Al-Haramain has been subject to NSA surveillance may seem, without more, somewhat innocuous. The organization posits that the very existence of the TSP, and Al-Haramain's status as a "Specially Designated Global Terrorist," suggest that the government is in fact intercepting Al-Haramain's communications. But our judicial intuition about this proposition is no substitute for documented risks and threats posed by the potential disclosure of national security information. Thus, we look to the government's filings, along with publicly available materials and relevant case law, to review the district court's privilege determination.

It is no secret that the Sealed Document has something to do with intelligence activities. Beyond that, we go no further in disclosure. The filings involving classified information, including the Sealed Document, declarations and portions of briefs, are referred to in the pleadings as *In Camera or Ex Parte* documents. Each member of the panel has had unlimited access to these documents.

**[8]** We have spent considerable time examining the government's declarations (both publicly filed and those filed under seal). We are satisfied that the basis for the privilege is exceptionally well documented. Detailed statements underscore that

disclosure of information concerning the Sealed Document and the means, sources and methods of intelligence gathering in the context of this case would undermine the government's intelligence capabilities and compromise national security. Thus, we reach the same conclusion as the district court: the government has sustained its burden as to the state secrets privilege.

We must next resolve how the litigation should proceed in light of the government's successful privilege claim. *See El-Masri*, 479 F.3d at 304. The privilege, once found to exist, "cannot be compromised by any showing of need on the part of the party seeking the information." *In re Sealed Case*, 494 F.3d 139, 144 (D.C. Cir. 2007) (internal citation omitted). The effect of the government's successful invocation of privilege "is simply that the evidence is unavailable, as though a witness had died, and the case will proceed accordingly, with no consequences save those resulting from the loss of evidence." *Ellsberg v. Mitchell*, 709 F.2d 51, 64 (D.C. Cir. 1983) (internal citation omitted).

After correctly determining that the Sealed Document was protected by the state secrets privilege, the district court then erred in forging an unusual path forward in this litigation. Though it granted the government's motion to deny Al-Haramain access to the Sealed Document based on the state secrets privilege, the court permitted the Al-Haramain plaintiffs to file *in camera* affidavits attesting to the contents of the document from their memories. *Al-Haramain*, 451 F. Supp. 2d at 1229.

**[9]** The district court's approach—a commendable effort to thread the needle—is contrary to established Supreme Court precedent. If information is found to be a privileged state secret, there are only two ways that litigation can proceed: (1) if the plaintiffs can prove "the essential facts" of their claims "without resort to material touching upon military secrets," *Reynolds*, 345 U.S. at 11, or (2) in accord with the procedure

outlined in FISA. By allowing *in camera* review of affidavits attesting to individuals' memories of the Sealed Document, the district court sanctioned "material touching" upon privileged information, contrary to *Reynolds*. *See* 345 U.S. at 11. Although FISA permits district court judges to conduct an *in camera* review of information relating to electronic surveillance, there are detailed procedural safeguards that must be satisfied before such review can be conducted. *See, e.g.*, 50 U.S.C. § 1806(f). The district court did not address this issue nor do we here.

**[10]** Moreover, the district court's solution is flawed: if the Sealed Document is privileged because it contains very sensitive information regarding national security, permitting the same information to be revealed through reconstructed memories circumvents the document's absolute privilege. *See Reynolds*, 345 U.S. at 10 (A court "should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers."). That approach also suffers from a worst of both world's deficiency: either the memory is wholly accurate, in which case the approach is tantamount to release of the document itself, or the memory is inaccurate, in which case the court is not well-served and the disclosure may be even more problematic from a security standpoint. The state secrets privilege, because of its unique national security considerations, does not lend itself to a compromise solution in this case. The Sealed Document, its contents, and any individuals' memories of its contents, even well-reasoned speculation as to its contents, are completely barred from further disclosure in this litigation by the common law state secrets privilege.

## IV.    ABSENT THE SEALED DOCUMENT, AL-HARAMAIN CANNOT ESTABLISH STANDING

The requirements for standing are well known to us from the Supreme Court's decision in *Lujan v. Defenders of Wild-*

*life*, 504 U.S. 555 (1992). Standing requires that (1) the plaintiff suffered an injury in fact, *i.e.*, one that is sufficiently "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable" to the challenged conduct, and (3) the injury is "likely" to be "redressed by a favorable decision." *Id.* at 560-61 (internal quotations and alteration omitted).

Al-Haramain cannot establish that it suffered injury in fact, a "concrete and particularized" injury, because the Sealed Document, which Al-Haramain alleges proves that its members were unlawfully surveilled, is protected by the state secrets privilege. At oral argument, counsel for Al-Haramain essentially conceded that Al-Haramain cannot establish standing without reference to the Sealed Document. When asked if there is data or information beyond the Sealed Document that would support standing, counsel offered up no options, hypothetical or otherwise. Thus, Al-Haramain has indicated that its ability to establish injury in fact hinges entirely on a privileged document. It is not sufficient for Al-Haramain to speculate that it might be subject to surveillance under the TSP simply because it has been designated a "Specially Designated Global Terrorist."

**[11]** "[E]ven the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Reynolds*, 345 U.S. at 11. Because we affirm the district court's conclusion that the Sealed Document, along with data concerning surveillance, are privileged, and conclude that no testimony attesting to individuals' memories of the document may be admitted to establish the contents of the document, Al-Haramain cannot establish that it has standing, and its claims must be dismissed, unless FISA preempts the state secrets privilege.

## V. FISA AND PREEMPTION OF THE STATE SECRETS PRIVILEGE

Under FISA, 50 U.S.C. §§ 1801 *et seq.*, if an "aggrieved person" requests discovery of materials relating to electronic

surveillance, and the Attorney General files an affidavit stating that the disclosure of such information would harm the national security of the United States, a district court may review *in camera* and ex parte the materials "as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f). The statute further provides that the court may disclose to the aggrieved person, using protective orders, portions of the materials "where such disclosure is necessary to make an accurate determination of the legality of the surveillance." *Id.* The statute, unlike the common law state secrets privilege, provides a detailed regime to determine whether surveillance "was lawfully authorized and conducted." *Id.*

**[12]** As an alternative argument, Al-Haramain posits that FISA preempts the state secrets privilege. The district court chose not to rule on this issue. *See Al-Haramain*, 451 F. Supp. 2d at 1231 ("I decline to reach this very difficult question at this time, which involves whether Congress preempted what the government asserts is a constitutionally-based privilege."). Now, however, the FISA issue remains central to Al-Haramain's ability to proceed with this lawsuit. Rather than consider the issue for the first time on appeal, we remand to the district court to consider whether FISA preempts the state secrets privilege and for any proceedings collateral to that determination. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (stating that the court of appeals should not ordinarily consider issue not passed on below); *Barsten v. Dep't of Interior*, 896 F.2d 422, 424 (9th Cir. 1990) (observing that the wisest course is to allow district court to consider issue first).

**REVERSED and REMANDED.**