**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>

Zayn Al-Abidin Muhammad
Husayn; Joseph Margulies,
   *Petitioners-Appellants*,

v.

James Elmer Mitchell; John
Jessen,
     *Respondents*,

United States of America,
   *Intervenor-Appellee.*

</td><td>

No. 18-35218

D.C. No.
2:17-cv-00171-
JLQ

OPINION

</td></tr>
</table>

Appeal from the United States District Court
for the Eastern District of Washington
Justin L. Quackenbush, District Judge, Presiding

Argued and Submitted March 5, 2019
Seattle, Washington

Filed September 18, 2019

Before: Ronald M. Gould and Richard A. Paez, Circuit
Judges, and Dean D. Pregerson,* District Judge.

---

 * The Honorable Dean D. Pregerson, United States District Judge
for the Central District of California, sitting by designation.

Opinion by Judge Paez;
Dissent by Judge Gould

**SUMMARY**[**]

**State Secrets Privilege / Subpoena**

The panel reversed the district court's order quashing a subpoena sought by Abu Zubaydah, who is currently held at the U.S. detention facility in the Guantanamo Bay Naval Base in Cuba, and his attorney ("Petitioners"), and dismissing the case in its entirety.

Petitioners filed an ex parte application for discovery pursuant to 28 U.S.C. § 1782, and sought an order to subpoena James Elmer Mitchell and John Jessen for their depositions for use in an ongoing criminal investigation in Poland about the torture to which Abu Zubaydah was subjected in that country. The district court originally granted the discovery application, but subsequently quashed the subpoenas after the U.S. government intervened and asserted the state secrets privilege.

The panel agreed with the district court that certain information requested was not privileged because it was not a state secret that would pose an exceptionally grave risk to national security. The panel agreed that the government's assertion of the state secrets privilege was valid over much of the information requested. The panel concluded, however, that the district court erred in quashing the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

subpoenas in toto rather than attempting to disentangle nonprivileged from privileged information. The panel remanded for further proceedings.

Judge Gould dissented, and would affirm the district court. Judge Gould would defer to the view of then-CIA Director and current Secretary of State Michael Pompeo that the disclosure of secret information in this proceeding "reasonably could be expected to cause serious, and in many instances, exceptionally grave damage to U.S. national security."

## COUNSEL

David F. Klein (argued) and John Chamberlain, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; Jerry Moberg, Jerry Moberg & Associates, Ephrata, Washington; for Petitioners-Appellants.

H. Thomas Byron III (argued), Appellate Staff; Joseph H. Harrington, United States Attorney; Civil Division, United States Department of Justice, Washington, D.C.; for Intervenor-Appellee.

## OPINION

PAEZ, Circuit Judge:

Zayn al-Abidin Muhammad Husayn ("Abu Zubaydah")[1] is currently held at the U.S. detention facility in the Guantanamo Bay Naval Base in Cuba. Abu Zubaydah was formerly detained as part of the Central Intelligence Agency ("CIA")'s detention and interrogation program, also commonly known as the post-9/11 "enhanced interrogation" or torture program. In 2017, Abu Zubaydah and his attorney, Joseph Margulies (collectively "Petitioners"), filed an ex parte application for discovery pursuant to 28 U.S.C. § 1782, which permits certain domestic discovery for use in foreign proceedings. They sought an order to subpoena James Elmer Mitchell and John Jessen for their depositions for use in an ongoing criminal investigation in Poland about the torture to which Abu Zubaydah was subjected in that country. The district court originally granted the discovery application, but subsequently quashed the subpoenas after the U.S. government intervened and asserted the state secrets privilege.

The Supreme Court has long recognized that in exceptional circumstances, courts must act in the interest of the country's national security to prevent the disclosure of state secrets by excluding privileged evidence from the case and, in some instances, dismissing the case entirely. *See Totten v. United States*, 92 U.S. 105 (1875); *see also United States v. Reynolds*, 345 U.S. 1 (1953). This appeal presents a narrow but important question: whether the district court

---

[1] Abu Zubaydah's birth name was Zayn al-Abidin Muhammad Husayn but he is known as Abu Zubaydah in litigation and public records.

erred in quashing the subpoenas after concluding that not all the discovery sought was subject to the state secrets privilege.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse. We agree with the district court that certain information requested is not privileged because it is not a state secret that would pose an exceptionally grave risk to national security. We also agree that the government's assertion of the state secrets privilege is valid over much of the information requested. We conclude, however, that the district court erred in quashing the subpoenas in toto rather than attempting to disentangle nonprivileged from privileged information.

We have "emphasize[d] that it should be a rare case when the state secrets doctrine leads to dismissal at the outset of a case." *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1092 (2010) (en banc); *see also Reynolds*, 345 U.S. at 9–10 (noting that "[j]udicial control over the evidence in a case cannot be abdicated to the caprice of executive officers"). Here, the underlying proceeding is a limited discovery request that can be managed by the district court, which is obligated "to use its fact-finding and other tools to full advantage before it concludes that the rare step of dismissal is justified." *Mohamed*, 614 F.3d at 1093. We therefore reverse the district court's judgment dismissing Petitioners' section 1782 application for discovery and remand for further proceedings.[2]

---

[2] Because the district court granted the motion to quash based on the state secrets privilege, it did not address the government's alternative arguments under the Central Intelligence Agency Act, 50 U.S.C. § 3507, and the National Security Act, 50 U.S.C. § 3024(i). If relevant, the district court may consider these arguments on remand.

# I.

## A.

In late March 2002, Pakistani government authorities, working with the CIA, captured Abu Zubaydah in Pakistan. At the time, Abu Zubaydah was thought to be a high-level member of Al-Qa'ida[3] with detailed knowledge of terrorist plans. A 2014 report by the Senate Select Committee on Intelligence Study on the CIA's detention and interrogation program ("Senate Select Committee Report") later revealed this characterization to be erroneous.

In the first four years of his detention, Abu Zubaydah was held as an enemy combatant and transferred to various secret CIA "dark sites" for interrogation. Journalists, non-governmental organizations, and Polish government officials have widely reported that one of those sites was in Poland. In 2015, the European Court on Human Rights ("ECHR") found that Abu Zubaydah was detained at a CIA site in Poland from December 2002 to September 2003.

Numerous sources also confirm that Abu Zubaydah was subjected to so-called "enhanced interrogation" techniques while detained at these CIA sites. These techniques were proposed and developed by Mitchell and Jessen,[4] who at that

---

[3] For consistency, we employ the spelling used by the Senate Select Committee Report in this opinion.

[4] Mitchell and Jessen are referred to as "SWIGERT" and "DUNBAR" in the Senate Select Committee Report, and have admitted to their involvement with the CIA program in a separate lawsuit, *Salim v. Mitchell*, No. 2:15-cv-286-JLQ, Answer to Complaint and Affirmative Defenses (E.D. Wash. June 16, 2016) ("*Salim*").

point were independent contractors for the CIA. They worked on "novel interrogation methods" intended to break down Abu Zubaydah's resistance, including the use of insects—to take advantage of his entomophobia—and mock burial. The details of Abu Zubaydah's treatment during this period are uncontroverted: he was persistently and repeatedly waterboarded; he spent hundreds of hours in a "confinement box," described as coffin-sized; he was subjected to various combinations of interrogation techniques including "walling,[5] attention grasps,[6] slapping, facial hold, stress positions, cramped confinement, white noise and sleep deprivation"; his food intake was manipulated to minimize the potential of vomiting during waterboarding. To use colloquial terms, as was suggested by the Senate Select Committee Report, Abu Zubaydah was tortured.

The ECHR found that some of this torture took place in Poland. Mitchell and Jessen traveled to the CIA black site there at least twice to supervise the interrogations. Declassified CIA cables confirm Mitchell's and Jessen's involvement in Abu Zubaydah's torture. Abu Zubaydah was eventually transferred to a succession of facilities outside of Poland before arriving in Guantanamo Bay, where he remains today. Abu Zubaydah has allegedly sustained permanent brain damage and physical impairments,

---

[5] According to a declassified U.S. Department of Justice Office of Legal Counsel ("OLC") memo, "walling" refers to when an individual is firmly pushed against a flexible false wall, hitting the shoulder blades, to create the sensation of physical impact that is worse than it is.

[6] The same OLC memo describes "attention grasp" to consist of grasping an individual with both hands, one hand on each side of the collar opening, in a controlled and quick motion, drawing the individual toward the interrogator.

including over 300 seizures in the span of three years and the loss of his left eye.

In 2010, Abu Zubaydah's attorneys and certain humanitarian organizations filed a criminal complaint in Poland on his behalf seeking to hold Polish officials accountable for their complicity in his unlawful detention and torture. That investigation closed without any prosecutions or convictions. In 2013, Abu Zubaydah's attorneys filed an application with the ECHR alleging that Poland had violated the Convention for the Protection of Human Rights and Fundamental Rights and failed to undertake a proper investigation. This resulted in the ECHR's decision in *Case of Husayn (Abu Zubaydah) v. Poland*, No. 7511/13, Eur. Ct. H.R. (2015). The court found "beyond reasonable doubt" that Abu Zubaydah was detained in Poland, that "the treatment to which [he] was subjected by the CIA during his detention in Poland . . . amount[ed] to torture," and that Poland had failed to abide by its obligations under the European Convention on Human Rights. The court accordingly awarded damages to Abu Zubaydah.

After the ECHR issued its decision—finding, among other things, that Poland failed to sufficiently investigate human rights violations related to Abu Zubaydah's treatment in Poland—Polish authorities reopened their investigations into the violations, focusing on the culpability of Polish citizens and government officials in Abu Zubaydah's detention. The Polish government requested evidence from the United States through the Mutual Legal Assistance Treaty ("MLAT") between the two countries. The United States denied the Polish government's request. Subsequently, Polish prosecutors followed up with Abu

Zubaydah's lawyers to ask for assistance with obtaining evidence necessary to pursue the prosecution.**[7]**

## B.

Abu Zubaydah and his attorney, Margulies, filed an ex parte application for discovery in the Eastern District of Washington pursuant to 28 U.S.C. § 1782.  Section 1782 provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."  Abu Zubaydah and his attorney sought a discovery order subpoenaing Mitchell and Jessen to produce documents and give deposition testimony for use in the ongoing criminal investigation in Poland.**[8]**  They requested that Mitchell and Jessen provide, among other related items, documents concerning the detention facility in Poland, the identities of Polish officials involved in the establishment or operation of the detention facility, the use of interrogation techniques, conditions of confinement and torture of those being held, and any contracts made between Polish government officials or private persons residing in Poland and U.S. personnel for use of the property upon which the detention facilities was located.

---

**[7]** Under Polish law, victims of crimes under investigation, like Abu Zubaydah, have a right to submit evidence through counsel to aid in the Polish Prosecutor's Office's investigation.

**[8]** Mitchell and Jessen co-founded Mitchell, Jessen & Associates, which is headquartered in Spokane, Washington, and Jessen resides in Spokane.  Hence, they both "reside[] or [are] found" in the relevant district.  28 U.S.C. § 1782.

The United States submitted a "Statement of Interest" arguing that the district court should not grant Abu Zubaydah's application based on the four factors outlined in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).**⁹**  The district court evaluated the section 1782 application under the *Intel* factors and found that the *Intel* factors weighed in favor of granting the application for discovery.  It noted that the government's concerns regarding privilege and classification of documents were hypothetical and could be raised at a later point.  The district court granted the application and Petitioners served the subpoenas on Mitchell and Jessen.

---

**⁹** The four *Intel* factors are: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad and the receptivity of the foreign government to U.S. federal-court assistance; (3) whether the discovery request is an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and, (4) whether the discovery request is unduly intrusive or burdensome.  *Intel*, 542 U.S. at 264–65. The third *Intel* factor allows the court to consider the potential for abuse of discovery for use in the foreign court.  *Id*. at 265.  "Once the court has determined that such abuses are unlikely," and grants the section 1782 application, "the ordinary tools of discovery management, including [Federal Rule of Civil Procedure] 26, come into play; and with objections based on the fact that discovery is being sought for use in a foreign court cleared away, section 1782 drops out." *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591, 597 (7th Cir. 2011) (citing *Ecuadorian Plaintiffs v. Chevron Corp.*, 619 F.3d 373, 377–78 (5th Cir. 2010); *Weber v. Finker*, 554 F.3d 1379, 1384–85 (11th Cir. 2009)).  In other words, once a section 1782 application is granted, the ordinary rules of civil procedure relating to discovery shift into place.

After Mitchell and Jessen entered their appearance in district court,[10] the U.S. government filed a motion to intervene and a motion to quash the subpoenas. In support of the latter motion, the government made three arguments. First, it argued that the district court lacked jurisdiction over the case under 28 U.S.C. § 2241(e)(2), which strips jurisdiction for courts to hear or consider any nonhabeas action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial or conditions of confinement of a designated enemy combatant outside the provisions of the Detainee Treatment Act of 2005, 10 U.S.C. § 801. Second, the government argued that the discovery sought is protected by the state secrets privilege, relying on two declarations from then-CIA Director, Michael Pompeo.[11] Third, it argued that both the National Security Act of 1947 and the Central Intelligence Agency Act of 1949 prohibit the discovery sought.

The district court granted the government's motion to intervene and motion to quash the subpoenas. The court rejected the government's first argument regarding the lack of jurisdiction, noting that the government offered nothing to establish an agency relationship between Mitchell and Jessen and the United States. The court then applied the three-part test outlined in *Mohamed*, 614 F.3d at 1080, to evaluate the government's assertion of the state secrets

---

[10] Neither Mitchell nor Jessen opposed the discovery requested in this case and have taken no position on the issues in this appeal.

[11] Pompeo submitted a declaration addressing Petitioners' section 1782 application and incorporated a prior declaration that he submitted in the *Salim* lawsuit.

privilege.[12]  First, it found that the government had followed the procedural requirements for invoking the privilege. Second, it concluded that the fact of the CIA's involvement with a facility in Poland was not a state secret that posed an exceptionally grave risk to national security.  The court agreed, however, that other information, such as the roles and identities of Polish citizens involved with the CIA site, is covered by the state secrets privilege.  Third, the court concluded that "[m]eaningful discovery cannot proceed in this matter without disclosing information that the Government contends is subject to the state secrets privilege," and thus it granted the motion to quash the subpoenas in their entirety and entered judgment.  Abu Zubaydah and Margulies timely appealed.

## II.

"We review de novo the interpretation and application of the state secrets doctrine and review for clear error the district court's underlying factual findings." *Mohamed*, 614 F.3d at 1077 (citing *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007)).

---

[12] Although the state secrets doctrine encompasses a complete bar under *Totten*, 92 U.S. at 107, and an evidentiary privilege under *Reynolds*, 345 U.S. at 7–8, the district court correctly concluded that the *Totten* bar does not apply in this case because the very subject matter of the action—the CIA's enhanced interrogation program—is not a state secret. *See Mohamed*, 614 F.3d at 1085–89 (applying *Reynolds* privilege analysis); *see also El-Masri v. United States*, 479 F.3d 296, 307–10 (4th Cir. 2007) (same).

## III.

Petitioners argue that the district court erred in quashing the subpoenas in their entirety based on the state secrets privilege. The parties essentially disagree over the proper analysis under steps two and three under *Reynolds*.[13]

## A.

Before reviewing the district court's decision, we provide some brief background on the state secrets privilege. The privilege derives from a common law doctrine that "encompasses a 'privilege against revealing military [or state] secrets, a privilege which is well established in the law of evidence.'" *Mohamed*, 614 F.3d at 1079 (alterations in original) (quoting *Reynolds*, 345 U.S. at 6–7). "The privilege is not to be lightly invoked." *Al-Haramain*, 507 F.3d at 1196. "A successful assertion of privilege under *Reynolds* will remove the privileged evidence from the litigation." *Mohamed*, 614 F.3d at 1079. "Unlike the *Totten* bar, a valid claim of privilege under *Reynolds* does not automatically require dismissal of the case." *Id*. Assertion of the state secrets privilege "will require dismissal [where] it . . . become[s] apparent during the *Reynolds* analysis that

---

[13] We are not persuaded by the government's alternative argument that the district court's decision can be affirmed as an exercise of discretion to deny section 1782 discovery requests. First, the district court exercised its discretion to *grant* the section 1782 application after applying the *Intel* factors. That order is not on appeal. Moreover, the order that was appealed was not a discretionary one. The district court concluded that it was required by the state secrets privilege to quash the subpoenas. The government's attempt to challenge the district court's first order seeks to avoid the discretion expressly given to district courts over section 1782 applications. *See Intel*, 542 U.S. at 255–61 (rejecting categorical limitations on section 1782's reach based on the statute's text and legislative history giving discretion to the district court).

the case cannot proceed without privileged evidence, or that litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Id*.

The Supreme Court identified and applied the state secrets privilege in *Reynolds*, where three estates filed wrongful-death suits against the government following the untimely deaths of three civilian observers during a test flight of a B-29 bomber. 345 U.S. at 3. In discovery, plaintiffs sought production of the Air Force's official accident investigation report and the statements of three surviving crew members. *Id*. The Air Force refused to produce the materials, citing the need to protect national security and military secrets because the aircraft and personnel on board "were engaged in a highly secret mission," *id*. at 4, and the material could reveal information about the "development of highly technical and secret military equipment," *id*. at 5. The district court ordered the government to produce the documents in camera so that the court could determine whether they contained privileged material. When the government refused, the district court imposed sanctions and ruled against the government on the issue of negligence. *Id.* The Court of Appeals affirmed. *Id*.

The Supreme Court reversed and sustained the government's assertion of privilege after concluding, "from all the circumstances of the case, that there [wa]s a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id*. at 10. In reaching this conclusion, the Court noted "that this is a time of vigorous preparation for national defense" and that "air power is one of the most potent weapons in [the United States'] scheme of defense." *Id*. Rather than dismissing the case, however, the Court noted that it could be possible for the plaintiffs "to

adduce the essential facts as to causation [in support of their tort claims] without resort to material touching upon military secrets," and remanded for further proceedings. *Id*. at 11–12.

Based on *Reynolds*, we identified three steps for analyzing claims of the state secrets privilege:

> First, we must ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied. Second, we must make an independent determination whether the information is privileged. Finally, the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim.

*Mohamed*, 614 F.3d at 1080 (internal alterations and quotation marks omitted) (quoting *Al-Haramain*, 507 F.3d at 1202). The parties do not contest that the government fulfilled the first requirement by filing the declarations from then-CIA Director Pompeo, who formally asserted the state secrets privilege with specificity in this case. *See Reynolds*, 245 U.S. at 7–8 ("There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer."). We therefore proceed to the second and third steps of the *Reynolds* test.

## B.

"When the privilege has been properly invoked, 'we must make an independent determination whether the information is privileged.'" *Mohamed*, 614 F.3d at 1081 (quoting *Al-Haramain*, 507 F.3d at 1202). "The court must sustain a claim of privilege when it is satisfied, 'from all the

circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged.'" *Id.* (quoting *Reynolds*, 345 U.S. at 10). "The state secrets privilege has been held to apply to information that would result in 'impairment to the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments, or where disclosure would be inimical to national security.'" *Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1227 (9th Cir. 2019) (quoting *Black v. United States*, 62 F.3d 1115, 1118 (8th Cir. 1995)). We have on more than one occasion commented on the difficulty of defining what constitutes a "state secret." *Id.* (noting "the ambiguity . . . at the outset"); *Mohamed*, 614 F.3d at 1082 ("We do not offer a detailed definition of what constitutes a state secret.").

Our guidance on evaluating the need for secrecy has been contradictory. On the one hand, "we acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this area." *Al-Haramain*, 507 F.3d at 1203. On the other hand, "the state secrets doctrine does not represent a surrender of judicial control over access to the courts." *Mohamed*, 614 F.3d at 1082 (quoting *El-Masri*, 479 F.3d at 312). "Rather, 'to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary, it is essential that the courts continue critically to examine instances of its invocation." *Id.* (quoting *Ellsberg v. Mitchell*, 709 F.2d 51, 58 (D.C. Cir. 1983)). "We take very seriously our obligation to review the [claim] with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege." *Al-Haramain*, 507 F.3d at

1203. For instance, "an executive decision to *classify* the information is insufficient to establish that the information is privileged." *Mohamed*, 614 F.3d at 1082 (citing *Ellsberg*, 709 F.2d at 57). "Simply saying 'military secret,' 'national security' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege." *Al-Haramain*, 507 F.3d at 1203.

Here, the government asserts the state secrets privilege over seven categories of information: (1) information that could identify individuals involved in the CIA detention and interrogation program; (2) information regarding foreign government cooperation with the CIA; (3) information pertaining to the operation or location of any clandestine overseas CIA station, base, or detention facility; (4) information regarding the capture and/or transfer of detainees; (5) intelligence information about detainees and terrorist organizations, including intelligence obtained or discussed in debriefing or interrogation sessions; (6) information concerning CIA intelligence sources and methods, as well as specific intelligence operations; and, (7) information concerning the CIA's internal structure and administration.

One of the Pompeo declarations asserts that the discovery sought by Petitioners "would tend to confirm or deny whether or not [Mitchell and Jessen] have information about these categories as they pertain to whether or not the CIA conducted detention and interrogation operations in Poland and/or with the assistance of the Polish Government." Disclosure of the existence of a clandestine intelligence relationship or the extent to which a foreign government is covertly operating or sharing intelligence would, according to Pompeo, cause significant harm to national security because it would: (1) breach the trust on

which the relationship is based; (2) compromise the CIA's ability to obtain intelligence information or secure cooperation in counterterrorism operations; and (3) engender backlash from foreign governments. Furthermore, Pompeo asserts that the specific locations of CIA stations and information about former detention facilities are generally classified as "SECRET" and "TOP SECRET" respectively because acknowledging the location of covert facilities could endanger the safety of CIA officers and incite backlash from the host country.

Reviewing the government's documents, we note that much of the concern animating the assertion of the state secret privilege is that harm might result from the government's disclosure of certain information—in particular, confirming or denying the location of a CIA black site—rather than a concern that harm might result from the spread of the information *per se*. This is not surprising, as substantial aspects of the information that the government insists are privileged are basically public knowledge.[14] The Pompeo declaration acknowledges that there have been allegations by the media, nongovernmental organizations, and former Polish government officials of the CIA operating a detention facility in Poland. Pompeo explains that the government cannot control what former foreign government officials might choose to say, but that the absence of official

---

[14] We cannot agree with the dissent that Article III judges are "not in a position" to reach conclusions with publicly available facts. Dissent at 31. Indeed, the dissent's position appears to be inconsistent with our essential obligation to review state secrets critically, with a skeptical eye. *See Mohamed*, 614 F.3d at 1082 (quoting *El-Masri*, 479 F.3d at 312); *Al-Haramain*, 507 F.3d at 1203. We note further that, in the context of preliminary proceedings such as those here, we are not called upon to, and do not, render any final decision on the merits.

confirmation from the CIA is the key to preserving an "important element of doubt about the veracity of the information."[15]

Even if we accept that logic, however, the government fails to explain why discovery here could amount to such an "official confirmation." The conclusion that the existence of a CIA site in Poland is not a secret is *not* equivalent to a finding, either by the district court or this court, that the government has taken any official position on the existence of such a facility. Nothing in this opinion should be read to suggest otherwise. As the district court found, neither Mitchell nor Jessen are agents of the government.[16] The government has not contested—and we will not disturb— that finding. *See Mohamed*, 614 F.3d at 1077 (noting clear error standard). As private parties, Mitchell's and Jessen's disclosures are not equivalent to the United States confirming or denying anything.

Moreover, in light of the record, we agree with the district court that disclosure of certain basic facts would not

_____

[15] The district court, we note, did not accept the government's position, and did "not find convincing the claim that merely acknowledging, or denying, the fact the CIA was involved with a facility in Poland poses an exceptionally grave risk to national security." We need not and do not address that determination because, regardless whether governmental acknowledgment would implicate national security, as discussed below, nothing about the government's participation in discovery would constitute governmental acknowledgement or denial of the site's existence.

[16] Despite so concluding, the district court inconsistently determined at step three of the *Reynolds* analysis that the government's participation in discovery would constitute implicit governmental acknowledgment of the program. As discussed herein, *see infra* at n.18, we do not share that assessment.

"cause grave damage to national security."  *Al-Haramain*, 507 F.3d at 1195.  First, we agree with the district court and Petitioners that in order to be a "state secret," a fact must first be a "secret."   In other contexts where the state secrets privilege was applied, the privilege was used to withhold information that was not publicly accessible.  *See Mohamed*, 614 F.3d at 1087 ("We are precluded from explaining precisely which matters the privilege covers lest we jeopardize the secrets we are bound to protect."); *id*. at 1095 (Hawkins, J., joined by Schroeder, J., Canby, J., Thomas, J., and Paez, J., dissenting) (describing onerous procedure undertaken to preserve a "'cone of silence' environment" for us to review the sealed record en banc); *Al-Haramain*, 507 F.3d at 1203 (concluding that the "Sealed Document is protected by the state secrets privilege" after reviewing it in camera); *Kasza v. Browner*, 133 F.3d 1159, 1170 (9th Cir. 1998) ("Based on our *in camera* review of both General Moorman's and Secretary Widnall's classified declarations, . . . [w]e are convinced that release of such information would reasonably endanger national security interests."). Insofar as the government asserts privilege over the basic fact that the CIA detained Abu Zubaydah in Poland and that he was subjected to torture there, this certainly does not protect the disclosure of secret information, but rather prevents the discussion of already disclosed information in a particular case.

We note that the discovery request here comes indirectly from *current* Polish authorities, specifically, prosecutors who have been tasked by the ECHR and the Polish government to investigate the circumstances surrounding Abu Zubaydah's detention in Poland.  This is significant for two reasons.  First, it reaffirms our conclusion that the fact that the CIA operated in Poland and possibly collaborated with Polish individuals over Abu Zubaydah's detention is

not a secret that would harm national security. *Cf. Al-Haramain*, 507 F.3d at 1200 (noting how details given through "voluntary disclosures made by various officials" are not state secrets). Second, it undermines the asserted national security risks outlined by Pompeo's declarations, such as breaching trust with the cooperating country or generating backlash in that country. While we recognize the legitimacy of these concerns, they appear less of a concern when the other country—here, Poland—is investigating criminal liability of the subject matter involved in this discovery application.

Last, we emphasize the importance of striking "an appropriate balance . . . between protecting national security matters and preserving an open court system." *Id*. at 1203. While it is essential to guard the courts from becoming conduits for undermining the executive branch's control over information related to national security, these concerns do not apply when the alleged state secret is no secret at all, but rather a matter that is sensitive or embarrassing to the government. In other words, the rationale behind the state secrets privilege is to protect legitimate government interests, not to shield the government from uncomfortable facts that may be disclosed or discussed in litigation. Protecting the former is an unfortunate necessity in our complicated world of national and international affairs. Protecting the latter is inconsistent with the principle of an independent judiciary.

Reviewing Petitioners' request for documents, we agree with the district court that much, although not all, of the information requested by Petitioners is covered by the state secrets privilege. For instance, documents, memoranda, and correspondence about the identities and roles of foreign individuals involved with the detention facility, operational

details about the facility, and any contracts made with Polish government officials or private persons residing in Poland might implicate the CIA's intelligence gathering efforts. As explained in the Pompeo declaration, disclosure of the identities of foreign nationals who work with the CIA risks damaging the intelligence relationship and compromising current and future counterterrorism operations.

Nonetheless, we also agree with the district court that a subset of information is not—at least in broad strokes—a state secret, namely: the fact that the CIA operated a detention facility in Poland in the early 2000s; information about the use of interrogation techniques and conditions of confinement in that detention facility; and details of Abu Zubaydah's treatment there. These facts have been in the public eye for some years now, and we find no reason to believe that Mitchell and Jessen testifying about these facts "will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10. We therefore reject the government's blanket assertion of state secrets privilege over everything in Petitioners' discovery request. *See Fazaga*, 1202 F.3d at 1228 (reiterating "caution[] that courts should work 'to ensure that the state secrets privilege is asserted no more frequently and sweepingly than necessary.'" (quoting *Mohamed*, 614 F.3d at 1082)).

## C.

At step three of the *Reynolds* analysis, we face the more difficult task of determining how the matter should proceed in light of a successful claim of privilege.[17]    *Mohamed*,

---

[17] As the dissent notes, our main disagreement is at the third *Reynolds* step. Dissent at 30. The dissent's concern about "walking

614 F.3d at 1082.  We have held that, "whenever possible, sensitive information must be disentangled from nonsensitive information to allow for release of the latter." *Id*. (original alterations omitted) (quoting *Kasza*, 133 F.3d at 1166; *Ellsberg*, 709 F.2d at 57).  There are three limited circumstances in which a successful claim of privilege requires outright termination of the case: (1) where the plaintiff cannot prove the prima facie elements of the claim with nonprivileged evidence; (2) where the privilege deprives that defendant of information that would have otherwise given the defendant a valid defense to the claim; or (3) where the claims and defenses might theoretically be established without relying on the privileged evidence, but "it may be impossible to proceed with the litigation because—privileged evidence being inseparable from nonprivileged information that will be necessary to the claims or defenses—litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Id*. at 1083.

---

close" to "the line of actual state secrets" simply does not reflect the test from *Mohamed*, which requires that nonsensitive information be released "whenever possible." *Compare* Dissent at 31, *with Mohamed*, 614 F.3d at 1087–89.  The dissent also asserts, without any support, that the *Reynolds* step two analysis must also take into consideration the fact that the information sought here is ultimately destined for a foreign tribunal in Poland.  Dissent at 34.  A state secret, however, is a state secret in any forum, domestic or foreign.  The crux of the question is whether "there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *Reynolds*, 345 U.S. at 10.  Moreover, the dissent's analysis of *Reynolds* fails to consider the district court's authority to decide whether discovery should be provided to Petitioners in the first instance.  Only then would Petitioners be able to provide any information to a foreign tribunal.

The district court properly identified the third circumstance as the only one potentially applicable to a discovery proceeding such as this case.  We agree with Petitioners, however, that it is not impossible to separate secret information, and that the district court was too quick to quash the subpoenas and dismiss the case in its entirety.**[18]**

Unlike our prior cases, this case is a pure discovery matter where there are no claims to prove or defenses to assert.**[19]**  *See Mohamed*, 614 F.3d at 1075, 1093 (dismissing

---

**[18]** The district court determined that the government's acknowledgment of the existence of a CIA facility in Poland would not implicate a state secret, a conclusion we need not address nor that we necessarily share.  *See supra* at n.15.  The district court nonetheless proceeded to find dismissal appropriate under *Reynolds* step three because, given that Petitioners made clear that they seek information about Poland, "the Government participating could be viewed as implicit confirmation of operation of the Program in Poland."  As mentioned above, we reject that determination.  *See supra* at n.16.  The district court's inconsistent and erroneous view of the effect of the government's participation in discovery was fundamental to the court's conclusion that this case should be dismissed outright.  The district court found that implicit government acknowledgment, although "seemingly innocuous," was intertwined with state secrets.  As we already noted, however, nothing about the government's participation in this case would constitute official acknowledgment, implicit or otherwise.  Thus, the district court's *Reynolds* step three conclusion was based entirely upon a faulty predicate.

**[19]** For this reason, the dissent's reliance on *Mohamed*, *Al-Haramain*, and *Kasza* is off-base.  In those cases, plaintiffs sought information that belonged to what the courts deemed a "classified mosaic."  *Kasza*, 133 F.3d at 1166.  The courts were able to reach that conclusion because they all underwent the process of reviewing the contested material to determine that there was privileged information that could not be disentangled.  *See Mohamed*, 614 F.3d at 1095; *Al-Haramain*, 507 F.3d at 1203; *Kasza*, 133 F.3d at 1170.  That was an essential predicate to the courts' dismissal at step three of the *Reynolds* analysis.  *See, e.g.*,

suit against a U.S. corporation under the Alien Tort Statute based on its alleged involvement in the CIA extraordinary rendition program); *Al-Haramain*, 507 F.3d at 1205 (dismissing lawsuit against the United States because plaintiffs could not show standing without privileged document); *Kasza*, 133 F.3d at 1162–63 (affirming dismissal of citizen suits against the U.S. Air Force and Environmental Protection agency). Section 1782 provides the district court discretion to order an individual to give deposition testimony or produce documents for use in a foreign proceeding provided it does not violate "any legally applicable privilege." 28 U.S.C. § 1782(a). The government does not challenge the district court's exercise of that discretion or application of the *Intel* factors. *See supra* at n.13. By the terms of the statute, Petitioners can pursue any nonprivileged discovery within the parameters set by the district court.[20]

---

*Mohamed*, 614 F.3d at 1087 ("We have thoroughly considered plaintiffs' claims, several possible defenses and the prospective path of this litigation. We also have carefully and skeptically reviewed the government's classified submissions . . . We rely heavily on these submissions, which describe the state secrets implicated here, the harm to national security that the government believes would result from explicit or implicit disclosure and the reasons why, in the government's view, further litigation would risk that disclosure.").

Conversely, here, neither the district court nor we have had any occasion to review the contested material to reach that threshold question. Given the limited factual record, the dissent repeats the same error that the district court made by assuming the truth of the government's assertions—that it would not be possible to disentangle the privileged from nonprivileged—without first invoking available discovery tools as required by *Mohamed*. *See* 614 F.3d at 1089.

[20] We agree with Petitioners that, to the extent the district court denied discovery because disclosure of some information "would not seem to aid the Polish investigation," the district court erred by imposing

Moreover, the record suggests that Petitioners can obtain nonprivileged information from Mitchell and Jessen. At the district court, Petitioners argued:

> [W]e are here in order to understand the story around [Abu Zubaydah's claims in Poland] . . . You know, what was the narrative, what sort of treatment was Mr. Zubaydah subjected to, what was the feeding regime, how was he held, what medical care was he given, and of course, yes, we want to know if locals were involved in that and to what extent.
>
> . . .
>
> Now, ideally, Your Honor, because we think that these are not state secrets at this point in time, we would prefer that Mitchell and Jessen be permitted to testify as to the identities of people and where it occurred. But the prosecutor already knows where the events occurred and my suspicion is he has a good idea, although I'm not privy to the specifics of his investigation, of who, you know, who his targets are.

Even if Mitchell and Jessen are restricted from disclosing state secrets such as the identities of individuals involved with the detention facility, the non-secret information in

---

an extraneous requirement upon Petitioners. Whether discoverable information may or may not be "useful" in foreign proceedings has no bearing on whether the information is privileged.

their possession could provide context to Polish prosecutors or corroborate prosecutors' independent investigations.

More importantly, we conclude that the district court did not adequately attempt to disentangle the privileged from nonprivileged information.[21]  As we noted in *Mohamed*, "the standards for peremptory dismissal are very high and it is the district court's role to use its fact-finding and other tools to full advantage before it concludes that the rare step of dismissal is justified."  614 F.3d at 1092–93; *see also Reynolds*, 345 U.S. at 11–12 (remanding for further proceedings where plaintiffs potentially could pursue their tort action without using material touching upon military secrets); *cf. Heraeus*, 633 F.3d at 597 (noting that once the district court grants a section 1782 application, "the ordinary tools of discovery management . . . come into play").

Mitchell and Jessen have already provided nonprivileged information similar to that sought here in the *Salim* lawsuit before the district court, illustrating the viability of this disentanglement.  Excerpts of those depositions were included in the record and reflect how depositions could proceed in this case, such as with the use of code names and

---

[21] *See supra* at n.18.  This is an essential point that the dissent overlooks: where *Reynolds* privilege is successfully asserted at steps one and two, the default at step three is nonetheless to "whenever possible . . . disentangle[] [the sensitive information] from nonsensitive information to allow for the release of the latter."  *Kasza*, 133 F.3d at 1166 (quoting *Ellsberg*, 709 F.2d at 57); *see also Mohamed*, 614 F.3d at 1089 ("Dismissal at the pleading stage under *Reynolds* is a drastic result and should not be readily granted.").  The dissent would flip the default to dismissal, unless Petitioners met a newly imposed burden to demonstrate a specific plan for disentanglement.

pseudonyms, where appropriate.[22]    While this no doubt imposes a burden on the government to participate in discovery and object, where appropriate,[23] we have stressed that cases should be dismissed only "in the[] rare circumstances" that the district court is not able to employ protective procedures to prevent disclosure of state secrets. *Mohamed*, 614 F.3d at 1089.  We are not convinced that those rare circumstances exist here.  On remand, the district court may use the Pompeo declarations as a guide while employing tools such as in camera review, protective orders, and restrictions on testimony, *see id.*, in tailoring the scope of Mitchell's and Jessen's deposition and the documents they may be required to produce.

## IV.

We have grappled with the state secrets privilege on only rare occasions.  Given that the district court had only *Kasza*, *Al-Haramain* and *Mohamed* as guides in conducting its *Reynolds* analysis, we can understand why the district court was so quick to dismiss the proceedings at the third step.  The court's hasty dismissal, however, overlooked our "special burden to assure . . . that an appropriate balance is struck between protecting national security matters and preserving

---

[22] The dissent attempts to distinguish the situation in *Salim* and faults Petitioners for not presenting a viable disentanglement plan to the district court.  Dissent at 32–33.  Again, this disregards the fact that the district court never engaged in any disentanglement process or assessed what protective measures could be utilized to accomplish disentanglement.

[23] Eight U.S. government attorneys or experts were present at the depositions of Mitchell and Jessen in *Salim* to ensure that nothing confidential or privileged would be disclosed.

an open court system," *Mohamed*, 614 F.3d at 1081 (quoting *Al-Haramain*, 507 F.3d at 1203).

Our holding is a limited one: if, upon reviewing disputed discovery and meaningfully engaging the panoply of tools at its disposal, the district court determines that it is not possible to disentangle the privileged from nonprivileged, it may again conclude that dismissal is appropriate at step three of the *Reynolds* analysis. However, the district court may not skip directly to dismissal without doing more. "[A]s judges, we strive to honor *all* of these principles [of justice, transparency, accountability and national security]," and while "there are times when exceptional circumstances create an irreconcilable conflict between them," *id*. at 1073—on the limited record before us, this is not one of those times.

The world has moved on since we discussed the state secrets privilege in *Mohamed*. In the near decade that has passed, we have engaged in a public debate over the CIA's conduct during the early years of the war on terror. The district court correctly recognized that the state secrets privilege did not cover all the discovery sought by Petitioners, but failed to recognize that complete dismissal based on the state secrets privilege is reserved only for "rare cases." *Id*. at 1092.

**REVERSED** and **REMANDED** for further proceedings.

GOULD, Circuit Judge, dissenting:

I respectfully dissent.  The majority jeopardizes critical national security concerns in the hope that the district court will be able to segregate secret information from public information that could be discovered.  In this case, I would defer to the view of then-CIA Director and now Secretary of State Michael Pompeo that the disclosure of secret information in this proceeding "reasonably could be expected to cause serious, and in many instances, exceptionally grave damage to U.S. national security."

# I

A major source of my disagreement with the majority concerns Section III.C of the opinion, with its analysis of step three of the *United States v. Reynolds* test.  The majority and I agree with the district court that information about foreign nationals cooperating with the CIA, "operational details about the facility," and details about Poland's intelligence cooperation with the CIA are subject to the state secrets privilege.  We part ways with respect to how to proceed with carving this kind of information out of Petitioners' broad discovery requests.  Our circuit has previously contemplated a situation in which, in the face of the government's successful claim of state secrets privilege, "it may be impossible to proceed with the litigation because—privileged evidence being inseparable from nonprivileged information . . .—litigating the case . . . would present an unacceptable risk of disclosing state secrets." *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1083 (9th Cir. 2010) (en banc).  I would hold that this is such a proceeding and affirm the district court.

I also note that, while step three is a major concern in dissent, I am not in a position as an Article III judge to make a conclusion that it is agreed that Abu Zubaydah was detained and tortured in Poland.  Doubtless there is much media comment and some reasoning of the European Court of Human Rights that looked at this matter suggesting that conclusion.  But while the District Court findings suggest that there was some facility in Poland, I do not read the District Court findings to acknowledge that Abu Zubaydah was in fact tortured, and the definition of torture was highly disputed in our country and not ultimately decided by the U.S. Supreme Court in the context of this case.  For purposes of my dissenting analysis, it is sufficient if at step three of the *Reynolds*' test it appears that walking close to the line of actual state secrets may result in someone overstepping that line to the detriment of the United States.  I would not need to go further than that to accept the position of the CIA in its intervenor role in this case that the discovery should not proceed.

The majority remands this case so that Petitioners can pursue details about Abu Zubaydah's treatment that it believes are no longer secret, tasking the district court with disentangling that information from closely related topics that are indisputably subject to the state secrets privilege. The majority opinion characterizes this remaining information as information that Petitioners could provide as part of a "context to Polish prosecutors" under § 1782. However, our circuit has recognized that even otherwise innocuous information that provides a more coherent and complete narrative should not be produced where it may risk exposing a broader picture.  *See Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998) (holding that "if seemingly innocuous information is part of a classified mosaic, the state secrets privilege may be invoked to bar its disclosure and the

court cannot order the government to disentangle this information from other classified information"). This is the risk presented by the residual information that Petitioners will seek on remand. In combination with the circumstances of the proceeding and facts already made public, an attempt to disentangle the details of Abu Zubaydah's treatment in Poland could expose a broader mosaic of clandestine "intelligence activities, sources, or methods." *Mohamed*, 614 F.3d at 1086.

The majority recognizes that Petitioners' discovery requests could potentially pose a "risk of disclosing state secrets" such as details about the CIA's involvement with locations, individuals, and governments overseas because this kind of information may be closely tied to nonprivileged information. *Id.* at 1083. The majority responds to this concern by advising that "depositions could proceed in this case, with the use of code names and pseudonyms" in order to protect privileged details of CIA operations. Code names and pseudonyms had been used in a prior lawsuit to enable Mitchell and Jessen to be deposed without revealing sensitive information about a CIA black site.

But the district court judge in this case, who also heard that prior lawsuit, understood exactly why those tools would be ineffective in this circumstance. Because the entire premise of the proceeding and the basis for our jurisdiction concerns Polish prosecutorial efforts, the district court was correct to reason that "[a]llowing the matter to proceed with a code word, such as 'detention site blue' to replace Poland seems disingenuous." As the government argued, "regardless of what pseudonyms or fictitious words [Petitioners] would propose to use as a substitute, there's no escaping the fact that everything [they are] asking would relate to allegations about things that occurred in Poland,

people that were there, [and] activities that allegedly occurred there." Like the approach of the district court in *Al-Haramain*, the majority's instruction to use code names opens the door to secret information being "revealed through reconstruct[ion]" even if it is not directly produced. *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1204 (9th Cir. 2007). The *Al-Haramain* court rejected this sort of approach as the "worst of both world[s]." *Id*. Petitioners have not demonstrated that the use of code words could meaningfully restrict the information ultimately made public through these discovery requests, and the majority should not, therefore, suggest that national security would be protected by their use.

In brief, although the majority is right to emphasize our "special burden to assure . . . that an appropriate balance is struck between protecting national security matters and preserving an open court system," the majority does not recognize some of the ways in which this particular case presents unique challenges for step three of the *Reynolds* analysis. *Mohamed*, 614 F.3d at 1081. Because of the circumstances presented by a § 1782 proceeding, the information Petitioners seek is inextricably linked with particular intelligence missions and particular foreign intelligence contacts. Details about "the use of interrogation techniques and conditions of confinement in that detention facility . . . [and] Abu Zubaydah's treatment there" will inevitably be placed in the context of a Polish prosecution seeking to discover aspects of the CIA's presence in Poland and any foreign nationals working with the CIA there, topics the majority recognizes to be privileged. Without a more specific and plausible plan for obtaining that nonprivileged information and not risking the exposure of a broader picture of national security material, I would defer to then-Director Pompeo's assessment of the risks presented in allowing the

discovery proceeding to go forward.  For that reason, I must respectfully dissent from the majority's application of step three of the *United States v. Reynolds* test.  These concerns apply to any case in which the *Reynolds* test is applied and step three of that test must be addressed.

## II

Also, there are aspects of this case peculiar to the context of § 1782 and consideration of the *Reynolds* test when the sought information will be produced for a foreign country under § 1782.  I find it very troubling that the majority's analysis of the extent of the *Reynolds* privilege in section III.B of the opinion does not acknowledge and evaluate the consequences of the fact that the information sought in a discovery proceeding here under § 1782 is ultimately destined for a foreign tribunal in Poland.  Determining the extent of the state secrets privilege is a task that always aims at assuring "that an appropriate balance is struck between protecting national security matters and preserving an open court system."  *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1081 (9th Cir. 2010) (en banc) (citing *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007)).  *Reynolds* itself contemplated balancing the legitimate rights of survivors to sue about the deaths of their loved ones against concerns of potential harm from disclosing military secrets.  *See United States v. Reynolds*, 345 U.S. 1, 9 (1953) (holding that the state secrets privilege is guided by a "formula of compromise").  But how is that balance to be struck here where the information is sought for potential prosecutions in Poland of Polish citizens who may have worked in Poland with the Respondents?

I would hold that the *Reynolds* balance should recognize that information produced in domestic proceedings remains under the supervision of the United States court system in a

way that information produced in discovery for overseas tribunals does not. *Reynolds* makes clear that it is our domestic national security concerns that create a privilege against disclosure of information that may harm our country. *Id.* at 10. This country's judicial system stands to gain little from providing information to Polish prosecutors, while it is this country's national security that is being risked. Although it is true that § 1782 authorizes discovery for the benefit of foreign proceedings, it is also true that the *Reynolds* privilege requires a balancing test that can take into account that the sought discovery will be shipped overseas for the benefit of another country's judicial system, and at that point, totally out of control of a domestic court.

## III

For the reasons set forth above, I respectfully dissent.