**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ZAYN AL-ABIDIN MUHAMMAD HUSAYN; JOSEPH MARGULIES, *Petitioners-Appellants*, | No. 18-35218 |
| | D.C. No. 2:17-cv-00171-JLQ |
| v. | |
| JAMES ELMER MITCHELL; JOHN JESSEN, *Respondents*, | ORDER |
| UNITED STATES OF AMERICA, *Intervenor-Appellee.* | |

Filed July 20, 2020

Before: Ronald M. Gould and Richard A. Paez, Circuit Judges, and Dean D. Pregerson,* District Judge.

Order;
Concurrence by Judge Paez;
Dissent by Judge Bress

---

*The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

## SUMMARY[**]

### State Secrets Privilege / Subpoena

The panel denied a petition for rehearing en banc on behalf of the court.

In its opinion, filed September 18, 2019, the panel majority reversed the district court's order quashing a subpoena sought by Abu Zubaydah, who is currently held at the U.S. detention facility in the Guantanamo Bay Naval Base in Cuba, and his attorney, and dismissing the case in its entirety. The panel agreed with the district court that certain information requested was not privileged because it was not a state secret that would pose an exceptionally grave risk to national security. The panel agreed that the government's assertion of the state secrets privilege was valid over much of the information requested. The panel concluded, however, that the district court erred in quashing the subpoenas in toto rather than attempting to disentangle nonprivileged from privileged information. The panel remanded for further proceedings.

Judge Gould dissented and would affirm the district court. He would defer to the view of then-CIA Director and current Secretary of State Michael Pompeo that the disclosure of secret information in this proceeding "reasonably could be expected to cause serious, and in many instances, exceptionally grave damage to U.S. national security."

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring in the denial of rehearing en banc, Judge Paez wrote to explain why rehearing was not warranted. He wrote that the majority opinion stood solely for the narrow and well-settled proposition that before a court dismissed a case on state secret grounds, it must follow the three-step framework set forth in *United States v. Reynolds*, 345 U.S. 1 (1953). Judge Paez wrote that rather than let the matter proceed on remand before the district court, the dissenting opinion from the denial of rehearing en banc sought to eliminate the required analysis, without providing any factual or legal basis for doing so. Judge Paez wrote further that the dissent mischaracterized the district court proceedings and the majority opinion's holding, and disregarded the law of the circuit. He concluded that en banc review was inappropriate.

Dissenting from the denial of rehearing en banc, Judge Bress stated that he believed the majority's decision was premised on grave legal errors, conflicted with governing precedent, and posed a serious risk to national security. Judge Bress wrote that the majority opinion erred because: it treated information that was core state secrets materials as fair game in discovery; it vitiated the state secrets privilege because of information that was supposedly in the public domain; it failed to give deference to the CIA Director on matters uniquely within his national security expertise; and it discounted the government's valid national security concerns because the discovery was only sought against government contractors.

## COUNSEL

David F. Klein (argued) and John Chamberlain, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C.; Jerry Moberg, Jerry Moberg & Associates, Ephrata, Washington; for Petitioners-Appellants.

H. Thomas Byron III (argued) and Sharon Swingle, Appellate Staff; William D. Hyslop, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Intervenor-Appellee.

## ORDER

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration.[1] Fed R. App. P. 35. The petition for rehearing en banc is denied.

Attached are a concurrence to and dissent from the denial of rehearing en banc.

---

[1] Judges Miller and Collins did not participate in the deliberations or vote in this case.

PAEZ, Circuit Judge, joined by FLETCHER and BERZON, Circuit Judges, concurring in the denial of rehearing en banc:

I concur in the decision not to rehear this case en banc and write to emphasize why rehearing was not warranted.

## I.

I begin with what the majority opinion does not do. It does not require the government to disclose information, and it certainly does not require the disclosure of state secrets. *See Husayn v. Mitchell*, 938 F.3d 1123, 1137–38 (9th Cir. 2019). It does not compel the government to confirm or even acknowledge any alleged malfeasance abroad. *See id.* at 1133, 1135 n.18. And, critically, it does not direct the district court to compel discovery on remand if the court determines that nonprivileged materials cannot be disentangled from privileged materials. *See id.* at 1137–38.

Instead, the majority opinion stands solely for the narrow and well-settled proposition that before a court dismisses a case on state secret grounds, it must follow the three-step framework set forth in *Reynolds*—a procedure we have followed for decades and reaffirmed as recently as 2010. *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir. 2010) (en banc); *see also Husayn*, 938 F.3d at 1136–37. The district court never conducted the third step of that process, which requires a court to determine whether the contested materials contain nonprivileged information and, if so, whether there is any feasible way to segregate the nonprivileged information from the privileged information. *Mohamed*, 614 F.3d at 1082. Only after exhausting this effort can a district court contemplate dismissal. *Id.* The district court, however, never undertook that process. It instead dismissed Petitioners' discovery application outright, without ever "us[ing] its fact-finding or other tools

to full advantage before . . . conclud[ing] that [this] rare step . . . [was] justified." *Id.* at 1093. We thus remanded with a simple instruction: use the panoply of tools at the court's disposal to identify nonprivileged information and determine whether that information can be disclosed without risking national security, as our precedent requires. *Husayn*, 938 F.3d at 1137–38.

It may be that, on remand, the district court will ultimately reach the same result and determine that the government's motion to quash should be granted and that the proceeding must end. But rather than let the matter proceed as it should under our precedent, Judge Bress's dissent seeks to eliminate the required analysis, without providing any factual or legal basis for doing so. The dissent mischaracterizes the district court proceedings and the majority opinion's holding. It also disregards the law of this circuit. For those reasons, en banc review is inappropriate.

## II.

This matter began with Petitioners' application for discovery under 28 U.S.C. § 1782, which authorizes district courts to assist litigants in foreign tribunals in obtaining discovery.[1] The district court applied the relevant factors under *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 244–45 (2004),[2] considered the government's

---

[1] Because the majority opinion lays out the relevant facts and procedures, there is no need to repeat them in full here.

[2] A court considering whether to grant a § 1782 request may consider "the nature of the foreign tribunal"; "the character of the proceedings underway abroad and the receptivity of the foreign government to U.S. federal-court assistance"; "the receptivity of the foreign government, court, or agency to federal-court judicial

opposition to Petitioners' application, and granted the application for discovery. The government did not appeal the district court's § 1782 ruling.

The government later moved to quash the resulting subpoenas for depositions and documents. It first argued the district court lacked jurisdiction under 28 U.S.C. § 2241(e)(2), which deprives courts of jurisdiction over actions against the "United States or its agents" for the confinement of alien enemy combatants. 28 U.S.C. § 2241(e)(2); *see also Hamad v. Gates*, 732 F.3d 990, 995 (9th Cir. 2013). The district court rejected that argument, concluding that there was no evidence of an agency relationship between the government and James Elmer Mitchell and John Jessen. The government did not appeal this determination.

The government also argued that the information was privileged as a state secret under *Reynolds*. The district court ostensibly applied the *Reynolds* framework, which sets forth a three-step inquiry to analyze claims of state secrets privilege. At the second step, the court concluded that some, but not all, of the information sought by Petitioners was privileged. Although our caselaw requires that non-sensitive information be disentangled from privileged material and disclosed "whenever possible," *Mohamed*, 614 F.3d at 1082, the district court did not follow this precedent, and it did not make any attempt to disentangle the non-sensitive information. Instead, the court quashed the subpoenas and dismissed the petition in its entirety without conducting the

---

assistance"; "whether the . . . request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States"; and whether the request is "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 264–65.

required analysis, speculating that any nonprivileged information "would not seem to aid the [foreign] investigation."

## III.

As stated above, the majority opinion does not require the disclosure of information. It does not require the court to reach any specific conclusion about whether dismissal is warranted. It simply reemphasizes our requirement to conduct a proper, three-step *Reynolds* analysis in the first instance. The district court has not yet done so, having dismissed the entire matter without using any discovery tools at its disposal. Our decision in *Mohamed* is clear: "[I]t is the district court's role to use its fact-finding and other tools to full advantage before it concludes that the rare step of dismissal is justified." 614 F.3d at 1092–93. Accordingly, the majority opinion instructs the district court to "employ[]" those tools to "tailor[] the scope of Mitchell's and Jessen's deposition and the documents they may be required to produce." *Husayn*, 938 F.3d at 1137. The majority opinion recognized that, even after doing so, the district court may still determine dismissal is appropriate: "[I]f, upon reviewing disputed discovery and meaningfully engaging the panoply of tools at its disposal, the district court determines that it is not possible to disentangle the privileged from nonprivileged, it may again conclude that dismissal is appropriate at step three of the *Reynolds* analysis." *Id.*

## IV.

Judge Bress's dissent appears to raise three distinct arguments: (1) the majority opinion erred in holding that Abu Zubaydah's detention at a CIA black site in Poland is not a state secret, despite widespread acknowledgment of this fact; (2) the majority opinion did not sufficiently defer

to former CIA Director Michael Pompeo's assertion that *any* disclosures sought by Petitioners pose national security risks, even though a court has never independently reviewed the disclosures to confirm this representation; and (3) our instruction to *attempt* to disentangle privileged and nonprivileged information is an "impossible task" for district courts to undertake, even though our precedent requires it, and even though we did so in *Mohamed*.

To begin, the dissent characterizes the majority as disregarding the danger certain information poses to national security. The majority opinion does no such thing, and this argument is a red herring. The majority opinion acknowledges that some facts can be embarrassing to the government. 938 F.3d at 1134. The purpose of the state secrets privilege, however, is not to insulate the government from criticism: the fundamental threshold question is whether certain facts are secrets. Only then can the privilege possibly apply.[3]

The dissent's haphazard citations to *Mohamed* do not support the argument that the facts the Petitioners are seeking to discover, despite being public knowledge, are sufficiently "secret" to warrant application of the privilege. Dissent at 29–31. Indeed, in *Mohamed*, the en banc court, after "thoroughly and critically review[ing] the government's public and classified declarations," concluded "that at least some of the matters" that the government sought to protect were privileged, 614 F.3d at 1086, but publicly available information was *not*, *id.* at 1090. The dissent's citations to *Mohamed* are drawn not from the

---

[3] Besides, "[s]imply . . . invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege." *Al-Haramain Islamic Found. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007).

court's Step 2 discussion of whether any of the information sought was subject to the state secrets privilege, but rather from the discussion of *Step 3* of the *Reynolds* analysis, i.e., whether the case could proceed without implicating privileged material. *See* Dissent at 29–31 (citing *Mohamed*, 614 F.3d at 1089–90). *Mohamed* recognized that even though publicly available information was not privileged, any effort to defend against the plaintiffs' case "would unjustifiably risk disclosure of state secrets." 614 F.3d at 1090. This is the precise analysis that has never been conducted by any court in this case—the analysis that the majority opinion instructed the district court to conduct on remand.[4]

More troubling is the dissent's seemingly willful blindness to established facts. Given the overwhelming, publicly available evidence that Abu Zubaydah was detained at a black site in Poland, it is difficult to take seriously the suggestion that media outlets are untrustworthy and that the standards applied by other judicial bodies are inadequate. Good grief, the President of Poland publicly acknowledged in 2012 that, during his presidency, Abu Zubaydah was detained in Poland by the CIA.[5] As the majority opinion

---

[4] *Mohamed's* "observation" that certain undisclosed details about a publicly known project may themselves qualify as secrets is not controversial, and it certainly does not stand for the proposition that *any* as-yet undisclosed information is privileged as a matter of course. *See* 614 F.3d at 1089–90.

[5] *See, e.g.*, *Case of Husayn (Abu Zubaydah) v. Poland*, Section VI(D)(3), European Ct. of Human Rights (Feb. 16, 2015) ("Of course, everything took place with my knowledge. The President and the Prime Minister agreed to the intelligence co-operation with the Americans, because this was what was required by national interest."), *available at*: https://tinyurl.com/ybs7wane; "The hidden history of the CIA's prison

recognizes, to be "a 'state secret,' a fact must first be a secret." *Husayn*, 938 F.3d at 1133. Although it is not the court's role to compel the government to recognize these facts officially, it need not stand in thrall, in blithe disregard of the record and what the rest of the world has already acknowledged. The majority opinion does not require the government to take an official position on anything and agrees with the government's assertion of state secrets over other sensitive categories of information. *Id.* ("Nothing in this opinion should be read to suggest [that the government has taken any official position on the existence or location of such a facility]."); *id.* at 1135 n.18 ("[N]othing about the government's participation in this case would constitute official acknowledgment, implicit or otherwise."); *id.* at 1134 (listing categories of privileged information).

The dissent nonetheless takes up the government's belatedly raised argument, never presented to the panel, that any participation by Mitchell and Jessen would be tantamount to an official acknowledgment of certain facts. As an initial matter, the government's argument, to the extent it is grounded in an agency relationship, was presented to, and rejected by, the district court. Again, the government did not appeal that determination.

In any event, the dissent reads the majority opinion's treatment of Mitchell and Jessen as contractors far too broadly. The dissent asserts that no court "has held the state secrets privilege is removed or diminished when the discovery is directed to a government contractor," and warns

---

in Poland," WASHINGTON POST (Jan. 23, 2014), *available at*: https://tinyurl.com/ybowwp8p; "Inside the CIA's Secret Polish Torture Site," THE ATLANTIC (Jan. 24, 2014), *available at*: https://tinyurl.com/y98n7x86.

that a "contrary rule" would free litigants from the constraints of the privilege against the disclosure of state secrets. Dissent at 32. The majority opinion does not say otherwise. It does not hold or suggest that the nature of a secret is lessened if transmitted to or by a contractor. It states only that the government failed to explain *why* discovery by Mitchell or Jessen would amount to an official confirmation. *Husayn*, 938 F.3d at 1133. Most importantly, the government can still argue on remand that it should not disclose any information from Mitchell and Jessen that would amount to an official confirmation.

And, contrary to the dissent's assertion, *Mohamed* did *not* "[hold] that the state secrets privilege applied in a suit against a government contractor *because* the contractor could 'reveal[] information about how the United States government does or does not conduct covert operations.'" Dissent at 32 (quoting *Mohamed*, 614 F.3d at 1089) (emphasis added). Rather, we discussed the potential effects of a contractor's testimony in the context of *Reynolds* Step 3—not Step 2. *See Mohamed*, 614 F.3d at 1089. Our discussion had nothing to do with whether the privilege applied to the contractor's statements at Step 2, let alone whether the contractor's statements could be imputed to the government.

Notably absent from the government's petition for rehearing en banc and the dissent is any mention of the *Salim* litigation,[6] in which the same respondents, Mitchell and Jessen, disclosed similar information to that sought here, with the government's full participation in the discovery process. In fact, in that litigation, eight U.S. government attorneys or experts were present at the depositions of

---

[6] *Salim v. Mitchell*, No. 2:15-cv-286-JLQ (E.D. Wash. 2016).

Mitchell and Jessen to ensure that nothing confidential or privileged would be disclosed. *Husayn*, 938 F.3d at 1137 n.23. As the majority opinion recognizes, the fact that Mitchell and Jessen have provided nonprivileged information like that sought here illustrates that disentanglement is viable. *Id.* at 1137.

Last, a word about deference. Rather than focus on "our obligation to review the [government's claims] with a very careful, indeed a skeptical, eye," *see Mohamed*, 614 F.3d at 1082, the dissent urges we owe "some level of deference," Dissent at 27. As an initial matter, the majority opinion did give "some deference" to the government and did not dispute that official acknowledgment of certain facts might harm national security. The dissent, however, asks for a level of deference that is nothing short of unquestioning. The mere existence of information, absent any indication that it has been recognized by the United States government, is *not* an acknowledgment by the United States of anything. The majority opinion is clear on this point. *Husayn*, 938 F.3d at 1133.

The dissent urges deference not only to the government's assertion that official acknowledgment would be harmful, but also to the government's expansive definition of "official acknowledgment" itself. Indeed, the government takes the argument a step further, contending that Mitchell's and Jessen's actual relationship to the government is irrelevant because foreign governments might *perceive* their participation as official U.S. acknowledgment of the facts to which Mitchell and Jessen testify. Gov't Pet. for Reh'g En Banc at 12. This contention lays bare the philosophy underpinning the position advocated by the government and the dissent. It does not matter whether Mitchell and Jessen speak for the government, or indeed whether the government

"officially" acknowledges anything. All that matters is that the government says it matters. Under the dissent's approach, courts are left with nothing to do but accept the government's assertions at face value. Such an approach, besides contradicting Supreme Court precedent, is antithetical to democratic governance and will inevitably breed abuse and misconduct.

Although the majority opinion holds only that the district court failed to conduct a proper *Reynolds* Step 3 analysis, the dissent does not discuss Step 3 until page 33. The dissent asserts that it would be an "impossible task" to disentangle classified information from nonprivileged material, and that dismissal is therefore appropriate. Dissent at 35. But we have conducted this analysis often, without difficulty. *See, e.g.*, *Kasza v. Browner*, 133 F.3d 1159, 1166, 1170 (9th Cir. 1998); *Mohamed*, 614 F.3d at 1095; *Al-Haramain*, 507 F.3d at 1203. Unlike the en banc court in *Mohamed*, where we reviewed the contested material and then determined that disentanglement was not feasible, *see* 614 F.3d at 1087–89, the district court has yet to undertake this full Step 3 analysis. The district court, without using a single tool at its disposal, such as in camera review, protective orders, or restrictions on testimony, summarily determined that any nonprivileged information that might be disclosed could not be disentangled from privileged information and therefore dismissed the discovery application.[7]

For similar reasons, the dissent's references to other cases we have decided are simply inapt in this context. As

---

[7] As discussed above, the district court also inserted a "usefulness" requirement of its own design into the *Reynolds* Step 3 analysis and dismissed the entire matter because any non-privileged information "would not seem to aid the Polish investigation."

the majority opinion explains, those cases determined that nonprivileged information was enmeshed in a "classified mosaic," but only after reviewing specific, contested material and considering the role of that material in drawn-out litigation. *Husayn*, 938 F.3d at 1135 n.19 (citing *Kasza*, 133 F.3d at 1166; *Mohamed*, 614 F.3d at 1095; *Al-Haramain*, 507 F.3d at 1203). Here, however, the court is presented with a pure discovery matter—unencumbered by the "inherently complex and unpredictable" nature of typical adversarial litigation. *See Mohamed*, 614 F.3d at 1089. More importantly, however, and as discussed above, no material has yet been disclosed, let alone reviewed.**[8]**

---

**[8]** The dissent insists that "[in camera] review is *not* necessary to enforce the privilege," but this point is irrelevant for two reasons. Dissent at 36. First, *Reynolds* did not prohibit in camera review altogether. *See* 345 U.S. at 10 (refusing only to impose an "automatic[]" disclosure requirement under certain circumstances). Other courts, including ones cited by the dissent, recognize that in camera review may not only be appropriate but required. *Doe v. CIA*, 576 F.3d 95, 105 (2d Cir. 2009) ("Sometimes, however, review may require examination of the classified material itself."); *Sterling v. Tenet*, 416 F.3d 338, 345 (4th Cir. 2005) ("There may of course be cases where the necessity for evidence is sufficiently strong and the danger to national security sufficiently unclear that in camera review of all materials is required to evaluate the claim of privilege."). In any event, these limitations on in camera review, if they exist, come at *Reynolds* Step 2—not Step 3. *See Reynolds*, 345 U.S. at 10 ("Yet we will not go so far as to say that the court may automatically require a complete disclosure to the judge *before the claim of privilege will be accepted* in any case.") (emphasis added); *Doe*, 576 F.3d at 104–05; *Sterling*, 416 F.3d at 344. Here, the majority opinion agreed with the district court's assessment that at least some of the information Petitioners sought was not a state secret. *Husayn*, 938 F.3d at 1134. Thus, we simply reminded the district court that, during its attempt at disentanglement, it could use many tools at its disposal, including in camera review, to conduct a full *Reynolds* Step 3 analysis. *Id.* at 1137–38.

Finally, the majority anticipates that in some circumstances it may indeed be impossible to disentangle nonprivileged information from privileged material. The opinion states that the district court may, after fulfilling its role in the discovery process, so conclude. But the possibility that disentanglement will not be feasible does not justify the failure to make the attempt. Our precedent requires the district court to make every effort at disentanglement. *Mohamed*, 614 F.3d at 1082.

The dissent concludes with an entreaty to overhaul seventy years of precedent and kneecap *Reynolds* to limit its application in section 1782 proceedings. Dissent at 35–37. This proposal, which not even the government advocates, is not only extreme; it is unnecessary. The overwrought concerns about abuse by foreign litigants are addressed by section 1782 and the *Intel* factors. *See Intel*, 542 U.S. at 265 ("[A] district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States. Also, unduly intrusive or burdensome requests may be rejected or trimmed."). It appears the dissent's true problem is not with *Reynolds*, but with the district court's initial decision to grant Petitioners' section 1782 application. The government appears to share that distaste. It could have appealed, but it did not. En banc proceedings would not have been the appropriate remedy for that error.

For these reasons, I concur in the court's decision to deny rehearing this case en banc.

BRESS, Circuit Judge, joined by GOULD, CALLAHAN, M. SMITH, IKUTA, BENNETT, R. NELSON, BADE, LEE, HUNSAKER, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

Over formal objections from the Director of the CIA, a divided panel in this case rejected the United States' assertion of the state secrets privilege, potentially allowing discovery into the CIA's overseas interrogation of a suspected terrorist. The panel issued this ruling in the context of a discovery application under 28 U.S.C. § 1782, enabling any resulting documents and testimony to be used in a foreign tribunal—here, a quasi-criminal proceeding in Poland over which we lack any visibility and whose entire purpose is to expose U.S.-led counterintelligence operations conducted abroad.

The majority's decision is premised on grave legal errors, conflicts with governing precedent, and poses a serious risk to our national security. I therefore respectfully dissent from our decision not to hear this important case en banc.

I

A

Zayn al-Abidin Muhammad Husayn ("Abu Zubaydah") is a suspected Al Qaeda-associated terrorist. *See Ali v. Obama*, 736 F.3d 542, 543 (D.C. Cir. 2013) (Kavanaugh, J.). He was captured in Pakistan in 2002 and detained by the CIA as part of its former detention and interrogation program; since 2006, the Department of Defense has held him at Guantanamo Bay. Prior to his transfer there, Abu Zubaydah claims he was tortured at a CIA "black site," which he alleges was located in Poland.

In 2013, Abu Zubaydah's attorneys filed an application in the European Court of Human Rights ("ECHR"), alleging that Polish officials had been complicit in his unlawful detention and mistreatment.  *See Husayn (Abu Zubaydah) v. Poland*, App. No. 7511/13, Eur. Ct. H.R. (2015).  The Polish government declined to confirm or deny these claims but informed the ECHR that it had previously opened an investigation in 2008 into allegations that Polish officials had cooperated with the CIA.  *Id. ¶¶* 125–35, 370–71.  As part of that investigation, Poland had requested information from the United States under a mutual legal assistance treaty ("MLAT") between the two countries.  *Id.* ¶ 132.  Citing reasons of national security, the United States repeatedly refused to provide information on the CIA's operations.  *Id.* ¶¶ 132, 143.

Based in part on the negative inferences it drew from Poland's refusal to confirm or deny CIA operations within its borders, the ECHR determined that the CIA had tortured Abu Zubaydah with the complicity of the Polish government.  *Id.* ¶¶ 370–71, 395–96, 414–15, 431–35.  As a result, Poland renewed its inquiry, which Abu Zubaydah represents is a "Polish criminal investigation" that "is charged with examining whether Polish officials violated domestic law by opening, operating, and conspiring with the United States to detain and mistreat prisoners, including Abu Zubaydah," at a U.S.-run CIA facility in Poland.  To aid its investigation, Poland again requested assistance under its MLAT with the United States.  The United States again refused to surrender details concerning the CIA's activities—even after discussions between high-level officials from both governments.  The Polish prosecutor's office then turned to Abu Zubaydah's counsel to identify alternative ways to obtain the information, in this case through United States courts.

In May 2017, Abu Zubaydah and his attorney filed an application in federal district court under 28 U.S.C. § 1782, seeking discovery related to the CIA's covert activities in Poland.  Section 1782 permits a district court to order discovery "for use in a proceeding in a foreign or international tribunal, including criminal investigations." 28 U.S.C. § 1782(a).  Abu Zubaydah's application sought documents and testimony from Dr. James Elmer Mitchell and Dr. John "Bruce" Jessen, two former CIA contractors who "proposed and developed" the CIA's enhanced interrogation techniques, "supervise[d]" Abu Zubaydah's interrogations, and were "involve[d] in" his alleged torture. *Husayn v. Mitchell*, 938 F.3d 1123, 1127 (9th Cir. 2019).

Abu Zubaydah's § 1782 application was expansive, seeking a broad range of information relating to "the crimes committed against Abu Zubaydah on Polish soil," the involvement of Polish and United States officials in his detainment, and details about the CIA black site where the alleged interrogation and torture occurred.  Abu Zubaydah represented that given their "central role in the interrogation program and their presence at the Polish black site," Mitchell and Jessen could also provide information on "the identities of other witnesses to the crimes against Abu Zubaydah" and "agreements between Polish and U.S. officials."  According to Abu Zubaydah's application, all this information would be used to "aid the Polish prosecutors in their understanding of Polish civilian and governmental complicity in the operation."

After the district court initially granted Abu Zubaydah's application, the United States moved to intervene and quash the subpoenas.  In its motion to quash, the United States formally invoked the state secrets privilege and supported its assertion with two declarations from then-CIA Director and

now Secretary of State Michael Pompeo.  Director Pompeo's declarations outlined seven categories of information over which the United States asserted the privilege:

> [1]     Information     that     could     identify individuals involved in the program;
>
> [2]     Information     regarding     foreign government cooperation with the CIA;
>
> [3] Information pertaining to the operation or location of any clandestine overseas CIA station, base, or detention facility;
>
> [4] Information regarding the capture and/or transfer of detainees;
>
> [5] Intelligence information about detainees and     terrorist     organizations,     to     include intelligence     obtained     or     discussed     in debriefing or interrogation sessions;
>
> [6] Information concerning CIA intelligence sources and methods, as well as specific intelligence operations; and,
>
> [7]     Information     concerning     the     CIA's internal structure and administration.

As the CIA Director explained, Abu Zubaydah's requested discovery "would tend to confirm or deny whether or not [Mitchell and Jessen] have information about these categories as they pertain to whether or not the CIA conducted detention and interrogation operations in Poland and/or with the assistance of the Polish Government."

The Director warned that disclosure of this information "reasonably could be expected to cause serious, and in many instances, exceptionally grave damage to U.S. national security." He explained that maintaining the confidentiality of foreign partnerships is critical, for "if the CIA appears unable or unwilling to keep its clandestine liaison relationships secret, relationships with other foreign intelligence or security services could be jeopardized."

Pompeo also explained that whether some alleged information about the requested topics was already in the public domain was of no moment. "The absence of official confirmation from the CIA leaves an important element of doubt about the veracity of the information." That provided "an additional layer of confidentiality" that "would be lost . . . if the CIA were forced to confirm or deny the accuracy of speculation or unofficial disclosures."

The district court granted the United States' motion to quash. It agreed that the privilege covered "operational details concerning the specifics of cooperation with a foreign government" and that such discovery "legitimately could jeopardize national security." The district court concluded that the existence of a CIA facility on Polish soil and Poland's cooperation with the CIA were not secret because they had been discussed in publicly available documents. But it declined to allow discovery on that basis. Instead, the district court reasoned that "the mere fact of whether operations were conducted in Poland would not seem of much, if any, assistance to a Polish investigation" in light of the public documents, whereas proceeding with discovery would pose an unacceptable risk of disclosing state secrets.

B

Abu Zubaydah appealed, and a divided panel of this court reversed. *Husayn v. Mitchell*, 938 F.3d 1123, 1126 (9th Cir. 2019). The majority opinion acknowledged that "the government's assertion of the state secrets privilege is valid over much of the information requested." *Id.* But it held that the following information is not a state secret: "the fact that the CIA operated a detention facility in Poland in the early 2000s; information about the use of interrogation techniques and conditions of confinement in that detention facility; and details of Abu Zubaydah's treatment there." *Id.* at 1134. According to the majority, these facts were no longer "secret" because they were the subject of a Polish investigation and had been discussed in publicly available documents, such as media reports. *Id.* at 1127, 1132–34. The majority opinion also held that because Mitchell and Jessen are "private parties," their testimony would not be "equivalent to the United States confirming or denying anything"—even though Mitchell and Jessen were the government contractors who "proposed and developed" the CIA's interrogation techniques and "supervise[d]" Abu Zubaydah's interrogation. *Id.* at 1127, 1133.

Although the majority determined that most of the requested discovery was privileged, it remanded to the district court "to disentangle nonprivileged from privileged information," because, in the panel's view, "it is not impossible to separate secret information." *Id.* at 1126, 1135. While the majority allowed that the district court could on remand "again conclude" that "it is not possible to disentangle the privileged from [the] nonprivileged," the panel expressed the view that "the record suggests that [Abu Zubaydah] can obtain nonprivileged information from Mitchell and Jessen." *Id.* at 1136–37.

Judge Gould dissented. At the outset, he observed that he is "not in a position as an Article III judge" to say that certain matters were nonprivileged due to public reporting and would have thus "defer[red]" to Director Pompeo's views. *Id.* at 1138 (Gould, J., dissenting). Regardless, Judge Gould would have dismissed the § 1782 application because "an attempt to disentangle the details of Abu Zubaydah's treatment in Poland could expose a broader mosaic of clandestine 'intelligence activities, sources, or methods,'" thereby "jeopardiz[ing] critical national security concerns." *Id.* at 1138, 1139 (quoting *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1086 (9th Cir. 2010) (en banc)). Indeed, Judge Gould wrote, the requested information will be used in a "Polish prosecution seeking to discover aspects of the CIA's presence in Poland and any foreign nationals working with the CIA there, topics the majority recognizes to be privileged." *Id.* at 1140.

Judge Gould also warned that these national security concerns are heightened in a § 1782 proceeding, where discovered information "is ultimately destined for a foreign tribunal." *Id.* In his view, the balance of interests "should recognize that information produced in domestic proceedings remains under the supervision of the United States court system in a way that information produced in discovery for overseas tribunals does not." *Id.* In this case, any resulting documents and testimony would be exported for use in a quasi-criminal proceeding in Poland, "totally out of control" of the U.S. courts. *Id.*

## II

The serious legal errors in the majority opinion, and the national security risks those errors portend, qualified this case for en banc review. The majority opinion treats information that is core state secrets material as fair game in

discovery; it vitiates the state secrets privilege because of information that is supposedly in the public domain; it fails to give deference to the CIA Director on matters uniquely within his national security expertise; and it discounted the government's valid national security concerns because the discovery was only sought against government contractors—even though these contractors were the architects of the CIA's interrogation program and discovery of them is effectively discovery of the government itself.

The majority then tasked the district court with "disentangling" supposedly non-privileged information from information the majority acknowledged was clearly privileged. And all of this is happening in the context of a § 1782 application, where any resulting discovery will be transferred overseas to a foreign proceeding in Poland that purports to be investigating our country's intelligence efforts. This is not the result that precedent allowed, and I fear the majority's decision will pose unnecessary risks to our country's safety and security.

A

The state secrets privilege is a "privilege against revealing military secrets, a privilege which is well established in the law of evidence." *United States v. Reynolds*, 345 U.S. 1, 6–7 (1953). The privilege ensures the non-disclosure of information if "there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interest of national security, should not be divulged." *Id.* at 10; *see also Gen. Dynamics Corp. v. United States*, 563 U.S. 478, 484–85 (2011); *Mohamed*, 614 F.3d at 1081–82; *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007).

Given the competing interests at stake, "[w]here there is a strong showing of necessity, the claim of privilege should not be lightly accepted." *Reynolds*, 345 U.S. at 11. But the Supreme Court has also instructed that "even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." *Id.* Applying these principles, we have upheld application of the state secrets privilege on various occasions, as have other circuits. *See Mohamed*, 614 F.3d at 1073; *Al-Haramain*, 507 F.3d at 1204–05; *Kasza v. Browner*, 133 F.3d 1159, 1165–67, 1168–70 (9th Cir. 1998); *see also, e.g.*, *El-Masri v. United States*, 479 F.3d 296, 299–300 (4th Cir. 2007); *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 545 (2d Cir. 1991).

Applying the Supreme Court's leading decision in *Reynolds*, we analyze the United States' assertion of the state secrets privilege in three steps:

> First, we must ascertain that the procedural requirements for invoking the state secrets privilege have been satisfied. Second, we must make an independent determination whether the information is privileged. . . . Finally, the ultimate question to be resolved is how the matter should proceed in light of the successful privilege claim.

*Mohamed*, 614 F.3d at 1080 (ellipsis in original) (quotations omitted). Everyone agrees that through declarations from then-CIA Director Pompeo, the United States has formally asserted the state secrets privilege. *Husayn*, 938 F.3d at 1131. It is on steps two and three that my fine colleagues in the panel majority regrettably but manifestly erred.

B

In concluding that the United States had not demonstrated that the information sought in this case was entirely privileged, the majority opinion contradicts governing precedent, jeopardizing national security. While the majority agreed that "much . . . of the information requested by [Abu Zubaydah] is covered by the state secrets privilege," it held that "a subset of information is not" privileged, specifically: "the fact that the CIA operated a detention facility in Poland in the early 2000s; information about the use of interrogation techniques and conditions of confinement in that detention facility; and details of Abu Zubaydah's treatment there." *Id.* at 1134. The majority also held that "the record suggests that [Abu Zubaydah] can obtain nonprivileged information from Mitchell and Jessen," which the majority says would also include "the story around [Abu Zubaydah's claims in Poland]," "the narrative," and "what sort of treatment was Mr. Zubaydah subjected to." *Id.* at 1136 (second alteration in original) (quotations omitted).

This is serious error because the state secrets privilege should preclude discovery of these sensitive topics. In our en banc decision in *Mohamed*, we held that the state secrets doctrine "indisputably" may cover "information about whether any foreign government cooperated with the CIA in clandestine intelligence activities," "information about the scope or operation of the CIA terrorist detention and interrogation program," and "any other information concerning CIA clandestine intelligence operations that would tend to reveal intelligence activities, sources, or methods." 614 F.3d at 1086; *see also El-Masri*, 479 F.3d at 309 (state secrets privilege covers "information regarding the means and methods by which the CIA gathers intelligence"); *Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir.

2005) (privilege covers "the methods and operations of the Central Intelligence Agency").

This is substantially the same information Abu Zubaydah seeks in this case. The state secrets privilege recognizes that "protecting our national security sometimes requires keeping information about our military, intelligence, and diplomatic efforts secret." *Gen. Dynamics*, 563 U.S. at 484. Contrary to precedent, the majority opinion in this case treats topics that lie at the core of our counterterrorism efforts as permissible areas of inquiry.

Although "we must make an independent determination whether the information is privileged," *Mohamed*, 614 F.3d at 1081 (quoting *Al-Haramain*, 507 F.3d at 1202), we have also held that some level of deference is due to the government's assertion of privilege. As our en banc court explained in *Mohamed*, "[i]n evaluating the need for secrecy, 'we acknowledge the need to defer to the Executive on matters of foreign policy and national security and surely cannot legitimately find ourselves second guessing the Executive in this arena.'" *Id.* at 1081–82 (quoting *Al-Haramain*, 507 F.3d at 1203); *see also Kasza*, 133 F.3d at 1166 (explaining that a "claim of privilege is accorded the 'utmost deference' and the court's review of the claim of privilege is narrow").

In this case, then-CIA Director Pompeo submitted two substantial declarations attesting to the national security risks that Abu Zubaydah's discovery requests would present. Based on his expertise and vantage point, Director Pompeo identified specific categories of information that would pose a risk to national security. He then explained how disclosure of this information would harm the United States' intelligence and counterterrorism activities, including its

clandestine partnerships with other governments that assist the United States in its covert operations.

Contrary to our precedents and my colleague Judge Gould's compelling dissent, the panel decision does not reflect any apparent deference to the CIA Director's declarations. Instead, the majority reaches a conclusion directly at odds with that of the CIA Director: that "disclosure of certain basic facts would *not* cause grave damage to national security." *Husayn*, 938 F.3d at 1133 (emphasis added) (quotations omitted).

This is very concerning. Our deference to the Executive Branch is not unyielding, but when it comes to the sorts of counterintelligence and counterterrorism issues presented here, courts must recognize that their field of vision is limited. Such deference is not an abdication of judicial duty, but reflects a justified appreciation for the constitutional and national security considerations that a request like Abu Zubaydah's necessarily implicates. *See, e.g.*, *CIA v. Sims*, 471 U.S. 159, 179 (1985) ("The decisions of the [CIA] Director, who must of course be familiar with 'the whole picture,' as judges are not, are worthy of great deference given the magnitude of the national security interests and potential risks at stake.").

The majority's reason for not deferring to Director Pompeo's informed views marks an even further departure from precedent: that aspects of the government's program of interrogating suspected terrorists "are basically public knowledge." *Husayn*, 938 F.3d at 1132; *see also id.* at 1134 ("These facts have been in the public eye for some years now . . . ."); *id.* at 1138 ("[W]e have engaged in a public debate over the CIA's conduct during the early years of the war on terror."). As proof, the majority points to statements made by media outlets, the Polish government, and the European

Court of Human Rights. *See id.* at 1132–33. The majority's refusal to accord state secret protection on grounds of "public knowledge" conflicts with precedent and underscores the national security risks that the court's decision poses.

The majority opinion's reliance on publicly available information to narrow the privilege is a stark departure from the bedrock principle that "[t]he privilege belongs to the Government" and "can neither be claimed nor waived by a private party." *Reynolds*, 345 U.S. at 7 (footnotes omitted). In *Mohamed*, our en banc court thus specifically rejected the theory that public disclosure of information (by entities other than the United States itself) could defeat an otherwise valid state secrets claim. The *Mohamed* court "recognize[d] that plaintiffs ha[d] proffered hundreds of pages of publicly available documents . . . that they say corroborate some of their allegations concerning [a government contractor's] alleged participation in aspects of the extraordinary rendition program," including numerous media reports. 614 F.3d at 1089–90. *Mohamed* likewise recognized that "[a]ccording to plaintiffs, '[v]irtually every aspect of [one plaintiff's] rendition, including his torture in Egypt, has been publicly acknowledged by the Swedish government.'" *Id.* at 1074.

Yet notwithstanding all of this, we held the discovery could not proceed based on the state secrets privilege because "partial disclosure of the existence and even some aspects of the extraordinary rendition program does not preclude other details from remaining state secrets if *their* disclosure would risk grave harm to national security." *Id.* at 1090 (emphasis in original). The majority opinion in this case rejected this point on the theory that "[t]he world has moved on since we discussed the state secrets privilege in

*Mohamed*." *Husayn*, 938 F.3d at 1138. That commentary is unsupported, but regardless, the principle that only the government may waive the state secrets privilege is not a time-limited one. If anything, that principle has even greater resonance in a technology-driven world in which information can quickly become "publicly available" through so many means.

Director Pompeo's declaration also directly addressed the public disclosure issue and explained why the CIA believed that discovery should not proceed in this matter notwithstanding the information already in the public domain. As Director Pompeo attested, while "the media, nongovernmental organizations, and former Polish government officials have publicly alleged that the CIA operated a detention facility in Poland," "[t]hese allegations do not constitute an official acknowledgment by the CIA." This "absence of official confirmation from the CIA" is critical: it "carries with it an additional layer of confidentiality" and preserves "an important element of doubt." That, in turn, reduces the "motivat[ion of] hostile entities or foreign governments to take action against the CIA," while ensuring that foreign partners can "trust our ability to honor our pledge to keep any clandestine cooperation with the CIA a secret."

Courts, including ours, have recognized that the government has a national security interest in neither confirming nor denying a sensitive fact or event. *See Mohamed*, 614 F.3d at 1089 ("[T]here is precious little Jeppesen could say about its relevant conduct and knowledge without revealing information about how the United States government does *or does not* conduct covert operations.") (emphasis in original); *Kasza*, 133 F.3d at 1163 (enforcing privilege where the government maintained that

the privilege "barred the presentation of any evidence tending to confirm or disprove" certain facts relating to a classified facility); *see also Weinberger v. Catholic Action of Haw./Peace Educ. Project*, 454 U.S. 139, 146 (1981) (holding that allegations were "beyond judicial scrutiny" because "[d]ue to national security reasons, . . . the Navy can neither admit nor deny that it proposes to store nuclear weapons at [the facility]").

The panel majority in this case thus failed to recognize that regardless of whether some information is in the public domain, the concerns animating the state secrets privilege remain. Indeed, the notion that our country's state secrets privilege should turn on "what the rest of the world" has supposedly acknowledged, as Judge Paez's concurrence in the denial of rehearing en banc maintains, is antithetical to the core principles on which the privilege is founded.[1]

The majority offered a specific reason for disregarding Director Pompeo's determination about the national security significance of the United States' refusal to confirm or deny CIA operations in Poland: Mitchell and Jessen are "private parties," so their "disclosures are not equivalent to the United States confirming or denying anything." *Husayn*,

---

[1] The majority's reliance on findings of the European Court of Human Rights is especially troubling. *Husayn*, 938 F.3d at 1127–28, 1133–34. The ECHR reached conclusions about Abu Zubaydah's torture in Poland in part by drawing negative inferences from Poland's past "denial, lack of cooperation with the inquiry bodies and marked reluctance to disclose information of the CIA rendition activities in Poland." *Husayn (Abu Zubaydah)*, ¶ 435. If a foreign partner refused to confirm allegations to protect U.S. state secrets, and if a foreign court later relied on that refusal to infer the truth of the allegations, then under the majority's reasoning the allegations would become "public knowledge." It cannot be the law that foreign partners would destroy the U.S. state secrets privilege by trying to protect it.

938 F.3d at 1133; *see also id.* ("[N]either Mitchell nor Jessen are agents of the government."); *id.* at 1133 n.15 ("[N]othing about the government's participation in discovery would constitute governmental acknowledgement or denial of the site's existence."); *id.* at 1135 n.18 (same). This reflects another substantial legal error in the majority's opinion that creates national security risk and warranted en banc review.

I am aware of no court that has held the state secrets privilege is removed or diminished when the discovery is directed to a government contractor. To the contrary, in *Mohamed* itself, we held that the state secrets privilege applied in a suit against a government contractor because the contractor could "reveal[] information about how the United States government does or does not conduct covert operations." 614 F.3d at 1089 (emphasis omitted); *see also El-Masri*, 479 F.3d at 299–300 (applying state secrets privilege in suit involving government contractors). A contrary rule would enable an end-run around the privilege, as litigants could simply subpoena current or former contractors to avoid the privilege's strictures. That cannot be the law, especially when the United States regularly relies on contractors in national security functions.

According to Judge Paez's concurrence, the majority opinion "states only that the government failed to explain *why* discovery by Mitchell or Jessen would amount to an official confirmation." (Emphasis in original). The majority opinion is not so limited, but even so, the "why" here is abundantly clear. Mitchell and Jessen are not just any contractors. They are the experts who, by the majority's description, "proposed and developed" the CIA's enhanced interrogation techniques, "supervise[d] the interrogations" that are the subject of this proceeding, and were "involve[d] in Abu Zubaydah's torture." *Husayn*, 938 F.3d at 1127.

Their knowledge of CIA operations and interrogations in Poland is based on their work with the CIA. It is thus inconceivable that documents and testimony from such persons would not reflect U.S. "official acknowledgment, implicit or otherwise," as the majority opinion holds. *Id.* at 1135 n.18. That is especially the case when the United States will need to be actively involved in these proceedings to protect its interests the best it can.[2]

In short, while the majority opinion does not itself order the disclosure of state secret material, it introduces a legal framework under which privileged information is treated as non-privileged, for reasons that conflict with precedent. This improper framework poses untold risks for our national security, both in this case and in the future cases that must try to comply with the majority's decision.

C

Of course, even if some of the requested discovery here is non-privileged, the panel decision is still deeply problematic. Under our case law applying *Reynolds*, a matter cannot go forward when "it may be impossible to proceed with the litigation because—privileged evidence being inseparable from nonprivileged information that will be necessary to the claims or defenses—litigating the case to a judgment on the merits would present an unacceptable risk of disclosing state secrets." *Mohamed*, 614 F.3d at 1083.

---

[2] I do not understand how Judge Paez's concurrence can claim that "the government can still argue on remand that it should not disclose any information from Mitchell and Jessen that would amount to an official confirmation." The majority opinion forecloses that argument by holding that "[a]s private parties, Mitchell's and Jessen's disclosures are not equivalent to the United States confirming or denying anything." *Husayn*, 938 F.3d at 1133.

Judge Gould's panel dissent persuasively shows the majority's critical errors under this standard.

As Judge Gould explained, "even otherwise innocuous information that provides a more coherent and complete narrative should not be produced where it may risk exposing a broader picture." *Husayn*, 938 F.3d at 1139 (Gould, J., dissenting). That risk is acutely present here because the timing, location, and manner of Abu Zubaydah's alleged detention and interrogation are bound up in a "broader mosaic of clandestine 'intelligence activities, sources, or methods.'" *Id.* (quoting *Mohamed*, 614 F.3d at 1086).

The risk is even more severe given the nature of this proceeding. This is not a case where potentially secret information is relevant to some claim or defense in a lawsuit. Instead, exposing the classified "mosaic" is the *entire point* of the Polish criminal proceeding. As the panel majority explains, the requested discovery will ultimately be used to "provide context" to foreign prosecutors seeking to identify and prosecute Polish individuals who aided the CIA. *Id.* at 1136 (majority opinion). But the identities and roles of these individuals are privileged, as is much of their work with the CIA—as the panel concedes. *See id.* at 1134. The majority opinion thus creates a perfect storm, because any supposedly non-privileged information "will inevitably be placed in the context of a Polish prosecution seeking to discover aspects of the CIA's presence in Poland and any foreign nationals working with the CIA there, topics the majority recognizes to be privileged." *Id.* at 1140 (Gould, J., dissenting).

How, then, is the district court on remand supposed to "disentangle" all of this, *id.* at 1126, 1137 (majority opinion), without inadvertently disclosing highly sensitive intelligence and counterterrorism information that could

jeopardize our national security?   The majority has no plausible answer.  But what we know is that if a district court in *this case* is expected to undertake that impossible task, under the majority opinion district courts in virtually *any case* would be required to do so, because the information at issue here is at least as sensitive as any other.[3]

It was thus not accurate for the majority to frame its decision as a "narrow" and "limited" one.  *Id.* at 1126, 1137. The decision instead conveys the broad message to district courts that even in the face of the Supreme Court's decision in *Reynolds* and declarations from the CIA Director, district courts risk reversal if they do not undertake a "disentanglement" process that will be fraught with peril. That should not be the law of this circuit.

Judge Paez's concurrence now suggests the problem here was merely that "the district court never conducted the third step of" the *Reynolds* analysis because it never "us[ed] any discovery tools at its disposal," such as "in camera review, protective orders, or restrictions on testimony."  But these "tools" all entail the district court reviewing or holding proceedings involving clearly privileged information, as part of an effort to "disentangle" supposedly non-privileged items.  The suggestion that these "tools" must be utilized

---

[3] The majority suggested that depositions "could proceed in this case" "with the use of code names and pseudonyms, where appropriate," as was done in *Salim v. Mitchell*, No. 2:15-cv-286-JLQ (E.D. Wash. 2016).  *See Husayn*, 938 F.3d at 1137.  That suggestion is not workable here.  As the district judge—who also presided in *Salim*—explained, because the focus of Abu Zubaydah's proposed discovery is so plain, "[a]llowing the matter to proceed with a code word, such as 'detention site blue' to replace Poland seems disingenuous."

here is mistaken and only further jeopardizes national security.

*Reynolds* is clear that even an in camera review, the least intrusive and least risky of the options, is *not* necessary to enforce the privilege. *See Reynolds*, 345 U.S. at 10 ("[W]e will not go so far as to say that the court may automatically require a complete disclosure to the judge before the claim of privilege will be accepted in any case"). As the *Reynolds* Court explained, when "there is a reasonable danger that compulsion of the evidence will expose" state secrets, "the court should not jeopardize the security which the privilege is meant to protect by insisting upon an examination of the evidence, even by the judge alone, in chambers." *Id.*

We acknowledged that in camera review is not always necessary in *Mohamed*. 614 F.3d at 1081. And other circuits are in accord. *See, e.g.*, *Doe v. CIA*, 576 F.3d 95, 104 (2d Cir. 2009); *Sterling*, 416 F.3d at 345; *Zuckerbraun*, 935 F.2d at 548. As the Fourth Circuit explained, "when a judge has satisfied himself that the dangers asserted by the government are substantial and real, he need not—indeed, should not—probe further" with an in camera proceeding. *Sterling*, 416 F.3d at 345. These observations apply perforce to other proceedings, like the concurrence's reference to potential depositions of Mitchell and Jessen, which would create even greater risk that privileged information is improperly disclosed.

The suggestion in Judge Paez's concurrence that *Reynolds* requires an in camera review, or other proceedings that are even more treacherous, is therefore contrary to settled law. The district court here thus did not somehow fail to evaluate the third part of a three-part test. But regardless, further proceedings involving privileged information is now the perilous course that the district court must follow, a

course the majority opinion regrettably foreordains for many future cases where our country's sensitive military and intelligence information may be at stake.

## D

This would all be troubling enough if the resulting discovery were being used in domestic litigation. But here, any materials that are released will be sent over to a foreign legal system that we do not control. We should have recognized that when the state secrets privilege is asserted, the considerations are vastly different when the materials are being sought for use exclusively in a foreign proceeding. *See* 28 U.S.C. § 1782. That is particularly so when the foreign proceeding is dedicated to investigating our country's counterintelligence operations abroad.

As we explained in *Mohamed*, courts evaluating state secrets claims must ensure "that an appropriate balance is struck between protecting national security matters and preserving an open court system." 614 F.3d at 1081 (quotations omitted). But when we have addressed state secrets issues in prior cases, we were considering whether the materials could be used in U.S. litigation. *See id.* at 1075–76 (claims brought under Alien Tort Statute against U.S. corporation for its alleged involvement in the CIA's extraordinary rendition program); *Al-Haramain*, 507 F.3d at 1193, 1195 (claims for damages and declaratory relief brought against United States by Muslim charity allegedly subjected to surveillance program); *see also Reynolds*, 345 U.S. at 2–3 (claims under Tort Claims Act brought against United States concerning military aircraft accident).

The state secrets privilege was held to apply in these cases notwithstanding the resulting impediments it caused in our court system. Here, however, our courts are being used

as a vehicle for obtaining information that will be sent to Poland, which has already tried but failed to obtain this information through diplomatic channels. I agree with Judge Gould's panel dissent that it is "very troubling that the majority's analysis . . . does not acknowledge and evaluate the consequences of the fact that the information sought in a discovery proceeding here under § 1782 is ultimately destined for a foreign tribunal." *Husayn*, 938 F.3d at 1140 (Gould, J., dissenting). The balance of interests must be different when "the sought discovery will be shipped overseas for the benefit of another country's judicial system, and at that point, totally out of control of a domestic court." *Id.*

What message does the majority opinion send to persons and regimes around the world desirous of our country's secret information? It is that even if they strike out with the Executive Branch, they can come to the U.S. courts and try their chances by pointing to the supposed need for information in a foreign proceeding whose rules and approach may be very different than our own. In some cases, these § 1782 requests will yield nothing. But in other cases, the imprecise "disentanglement" process may shake loose a few nuggets of information, or even more. What will then be done with that information we cannot know. These are risks we should not tolerate and that a fair application of the state secrets privilege should protect against.

I respectfully dissent from the denial of rehearing en banc.